622 F.2d 466
 Nellie Atkins ARMSTRONG, Plaintiff-Appellant,
v.
MAPLE LEAF APARTMENTS, LTD., a Limited Partnership, Broken
Arrow Mall, Inc., a corporation, Owen D. Young and Robert L.
Latch, d/b/a Young & Latch Investments, a General
Partnership, Firsttul Mortgage Company, a corporation,
Sackman-Gilliland Corporation, a corporation, First National
Bank & Trust Company of Tulsa, Oklahoma, a National Banking
Association, Hamilton Investment Trust, a Massachusetts
Business Trust, Abercrombie, Pedigo & Smith, Inc., and H.
Harold Becko, Defendants-Appellees,
Ruskin F. Armstrong, husband of Nellie Atkins Armstrong,
Manuel Brown, and C. A. Whitebook, Third Party
Defendants-Appellees,
Creek Nation of Oklahoma, United States of America, Amici Curiae.
 No. 77-1680.
 United States Court of Appeals,
Tenth Circuit.
 Argued Aug. 7, 1978.
Decided May 17, 1979.
Rehearing Denied May 15, 1980.
 
 Jay C. Baker, of Baker, Baker & Martin, Tulsa, Okl. (C. Rabon Martin, Tulsa, Okl., with him on the brief), for appellant.
 William B. Jones, of Jones, Givens, Brett, Gotcher, Doyle & Bogan, Tulsa, Okl. (Philip J. Eller, Tulsa, Okl., with him on the brief), for appellees, Maple Leaf Apartments, Ltd., Broken Arrow Mall, Inc., Owen D. Young and Robert L. Latch, d/b/a Young & Latch Investments, Hamilton Investment Trust, and H. Harold Becko.
 Douglas L. Inhofe, of Conner, Winters, Ballaine, Barry & McGowen, Tulsa, Okl. (Royce H. Savage, Tulsa, Okl., with him on the brief), for appellees, Firsttul Mortgage Co., Sackman-Gilliland Corp., and The First National Bank & Trust Co. of Tulsa, Oklahoma.
 Robert H. Tips and Theodore P. Gibson, of Farmer, Woolsey, Tips & Gibson Incorporated, Tulsa, Okl., on the brief for appellee, Abercrombie, Pedigo & Smith, Inc.
 Philip W. Perryman, Tulsa, Okl. (John H. Charloe, Tulsa, Okl., on the brief), for amicus curiae, Creek Nation of Oklahoma.
 James W. Moorman, Asst. Atty. Gen., Jacques B. Gelin, and Robert L. Klarquist, Attys., Dept. of Justice, Washington, D. C., on the brief for amicus curiae, United States.
 Before SETH, Chief Judge, and HOLLOWAY and McKAY, Circuit Judges.
 SETH, Chief Judge.
 
 
 1
 This is an action to quiet title and to cancel deeds brought by the plaintiff who alleges that she is a Creek Indian of the half blood; that she conveyed the tract of land in question by warranty deed to H. Harold Becko in December 1965; and that this deed was not approved by a County Court of Oklahoma as required by the Act of Congress of August 4, 1947 (61 Stat. 731).
 
 
 2
 The trial court found for the defendants who were the subsequent grantors and those holding under them.
 
 
 3
 The plaintiff has taken this appeal. A preliminary aspect of this case was before this court and the opinion rendered thereon appears at 508 F.2d 518 (10th Cir.). The case was there remanded to the trial court.
 
 
 4
 The action so filed by plaintiff sought to cancel the original deed from her and subsequent deeds; to quiet title, and to eject those holding under the original grantor. Under the Oklahoma decisions this is an action in equity and equitable relief is sought. See Clovis v. Clovis, 460 P.2d 878 (Okl.); King v. Oakley, 434 P.2d 868 (Okl.). The plaintiff's principal cause appears to be the cancellation of the series of deeds from her to the original grantor, and those deeds to subsequent grantees. The basic attack is on the deed she originally delivered to Mr. Becko.
 
 
 5
 Some extended review of the facts, the sequence of events, and statutory changes is necessary. The larger tract, of which the land in question is a part, was a surplus allotment in 1903 to Billy Atkins, and he had received a deed from the Muskogee Creek Nation. In 1908, Congress by the Act of May 27, 1908, restricted the alienation of this land.
 
 
 6
 Billy Atkins died intestate in 1929 possessed of the tract. He was an enrolled full-blood Creek Indian, and left surviving three children born to himself and his non-Indian wife who had predeceased him.
 
 
 7
 Each of the three children, Creeks of the half blood, thus inherited an undivided one-third interest in the 120-acre tract. Their inheritance was confirmed by court proceedings after extended litigation in the state courts.
 
 
 8
 Upon the death of Billy Atkins, the restrictions on the land terminated automatically by operation of law, and the children took free of any restrictions on the land whatever, and, of course, they were free of any restrictions on themselves as individuals.
 
 
 9
 In 1944, the plaintiff and her two brothers exchanged deeds with the intention that the undivided interests would be eliminated and each would have the entire interest in a forty-acre tract. The land in issue is part of the forty-acre tract in which the plaintiff had an interest and to which she was deeded the undivided thirds of her two brothers.
 
 
 10
 Thus after the exchange of deeds, the plaintiff held the land in fee simple absolute. She was not under the General Allotment Act (25 U.S.C. § 331), she was as an individual under no restrictions whatever nor did she suffer any legal disability, and obviously was not a ward of the Government. The land itself was under no restrictions whatever by the Government, nor would the proceeds of a sale be restricted or limited in any way. The land was in this status until the effective date of the Act of August 4, 1947, and, of course, the above described status of the plaintiff continues until the present time.
 
 
 11
 The Act of August 4, 1947, related to the land only, and did place restrictions on it in the hands of the plaintiff. This Act was 61 Stat. 731 and entitled "An Act Relative to Restrictions Applicable to Indians of the Five Civilized Tribes of Oklahoma." The restrictions imposed by the Act of 1947 applied only to lands received by inheritance. Thus the restriction was on:
 
 
 12
 ". . . (A)ny interest in land acquired before or after the date of this Act by an Indian heir or devisee of one-half or more Indian blood when such interest in land was restricted in the hands of the person from whom such Indian heir or devisee acquired same . . ."
 
 
 13
 This is the Act relied on by the plaintiff as no effort was made to secure the approval of the county court of the deed from plaintiff to Becko.
 
 
 14
 The restriction imposed by this Act of August 4, 1947, pertains only to the particular type of land above described and was:
 
 
 15
 "(N)o conveyance (of such lands) shall be valid unless approved . . . by the county court of the county in Oklahoma in which the land is situated . . ."
 
 
 16
 Thus the interest of plaintiff in the lands in question was at least in part of the category described in the 1947 Act to require the conveyance thereof to be approved by the county court to be "valid." This Act of August 4, 1947, was not included in the United States Code. It was not generally known among attorneys in Oklahoma, according to the finding by the trial court.
 
 
 17
 The record also shows that the plaintiff was educated in the public schools and that she and her husband at one time had a small business. They planned to use part of the purchase price of the tract in question to acquire or build a new house in the same community, and this they did.
 
 
 18
 The plaintiff was represented by an attorney, Mr. F. A. Petrik, practicing in Broken Arrow at the time she and her brothers exchanged deeds and before. Apparently, he prepared the deeds for the exchange and testified he had represented the plaintiff since about 1938. He continued to represent her in the protracted dealings with prospective purchasers of the land and with the ultimate purchaser.
 
 
 19
 As mentioned, the plaintiff and her husband were planning to use a portion of the purchase price from the sale of the property in question to buy a place also in Broken Arrow for a new home. They contracted to buy this property for about $29,000.00 from Mr. Amos Beaver, a full-blood Creek, who had inherited it. They entered into this contract two days before they delivered the deed here concerned to Mr. Becko. In this contract with Mr. Amos Beaver was a requirement by the buyer that his conveyance to plaintiff be approved by the county court, and it was subsequently so approved. The petition for approval and the notices were drafted and signed by Mr. F. A. Petrik as attorney. This was, of course, in 1965, long after the repeal by the 1947 Act of sections 1 and 8 of the 1933 Act. The county court acted under the Act of August 4, 1947, with which we are here concerned. Mr. F. A. Petrik testified that he had handled a number of petitions for county court approval between 1947 and 1965. He testified further that, as to the Beaver purchase, he discussed with the plaintiff and her husband the fact that the deed would have to be approved and there would have to be these court proceedings.
 
 
 20
 The record also shows that on July 28, 1944, Mr. Petrik wrote to the attorney for the Indian agency at Muskogee about the estate of Billy Atkins. He recited in this letter that he had prepared deeds for the three heirs to exchange to accomplish a partition, and the deeds had been executed. Mr. Petrik received in July a reply to his inquiry from Mr. Robertson, the Probate Attorney at the agency. In this reply the attorney told him that the three heirs were half-bloods, that there was an heirship decree finding that they were the heirs. He also expressed the opinion that there were no restrictions. It is thus clear that Mr. Petrik was advised that the heirs were Creeks of the half blood. This was, of course, before the 1947 Act. The record also shows that the abstract prepared by the plaintiff for the sale in question showed that plaintiff was a half-blood Creek. The determination of heirship in 1934 and the related litigation also showed this.
 
 
 21
 Attorney Petrik represented the plaintiff and her husband during the extended negotiations on the series of options for the sale of the property in question. A brief description of these events would seem to be necessary.
 
 
 22
 In 1964, the plaintiff and her husband, after negotiations, gave an option to buy the property to Liles and Barry for a purchase price of $100,000.00. $2,000.00 was paid for the option which was for a period of six months with the right to renew for a like period for $2,000.00 additional. The option was so renewed, but expired in November of 1965. During this option, the optionees sought, with plaintiff's cooperation, annexation of the land to the City of Broken Arrow, sought, again with plaintiff's participation and signature on the two petitions, to have the property rezoned by the city and brought suit to have it accomplished. The optionees kept plaintiff advised of the progress of these efforts, and were at no time advised by plaintiff or Mr. Petrik that this work should not continue or that they were in any way dissatisfied. Liles and Barry sold their interest in the option on October 5, 1965, to defendant Becko and so advised plaintiff and her husband.
 
 
 23
 Mr. Becko did not exercise the option, as above mentioned, and instead started negotiations with plaintiff for a new option. His first proposal was rejected because plaintiff wanted a higher price. A second proposal was made by Becko, and it resulted in the execution of a new option agreement. The price was to be $107,500.00, the option term was for thirty days, the payments of the purchase price were to be over a period of fourteen months. Before the plaintiff and her husband executed this option, they sought and received tax advice from a CPA and from the Field Solicitor of the Bureau of Indian Affairs. They also, of course, received legal advice from Mr. Petrik.
 
 
 24
 The option was exercised by defendant Becko, the parties met in Mr. Petrik's office and closed the sale. The general warranty deed was delivered to Mr. Becko and he made the payment then due, and gave two notes for the balance secured by a mortgage. Mr. Becko in December of 1966 did not pay a note then due which represented part of the purchase price and so defaulted. He defaulted also as to the next payment, but no action was taken by plaintiff. Plaintiff was aware of her right to foreclose, as the trial court found. In January 1967, Mr. Becko tendered the total amount due and asked for a release of mortgage. The plaintiff demanded an additional $4,500.00 for such a release, and this was paid.
 
 
 25
 In 1968, plaintiff and her husband turned over possession of the land to defendant Becko. This was about a year and one-half after they had delivered the deed to Mr. Becko. They had by then bought land from Mr. Beaver in Broken Arrow, as above described, and built a house on it.
 
 
 26
 The defendant, Broken Arrow Mall, Inc., bought the land from Mr. Becko in December 1971, and later planned construction of apartments. The corporation received a loan of something over a million dollars on the property for this construction. A portion of the tract was also sold to Young & Latch. The buyers and the lenders had the abstracts examined, and none of the title opinions questioned the December 1965 deed to Becko.
 
 
 27
 In 1973 Maple Leaf Apartments commenced construction of some 116 units. These for the most part were leased and occupied at trial. The other purchasers, Young & Latch, began building the Maple Leaf Shopping Center in 1973, with a construction loan later converted to permanent financing. This construction was almost completed and leased by October 1973. Also Young & Latch had hired a contractor and had begun excavation for an eighty-five apartment development at the time of suit.
 
 
 28
 The plaintiff and her husband lived in Broken Arrow and saw the construction in progress on the tract they had sold to Becko and were fully aware of the work being done and the expenditures being made thereon. There is no issue as to this knowledge of the extensive development on this land costing something over a million dollars. Also the trial court found as a fact that plaintiff never changed her mind about the sale to Becko until suit was filed.
 
 
 29
 The plaintiff thus testified that she had seen on many occasions the shopping center being constructed and leased, the apartments being built and also leased, and the start of construction on the new eighty-five unit apartment group. Neither the plaintiff nor her attorney at any time before filing this suit made known that they were dissatisfied nor that they asserted any claim. Plaintiff thus remained silent while the development was constructed and completed. The shopping center was formally opened about four months before the suit, and the apartments were completed and leased two or three months before this suit.
 
 
 30
 The trial court found as a fact that the purchase price paid to the plaintiff by Becko was more than the then reasonable value of the land. This finding is amply supported by the testimony of the appraisers.
 
 
 31
 The plaintiff asserts that the 1947 Act applies to this transaction, and obviously it does. In the option agreement between plaintiff and the buyer Becko, she was to convey merchantable title. To do this she had to comply with the 1947 Act as she had required of the seller in the Amos Beaver purchase. It was her obligation to meet the contract requirements, and thereby, among the many other things, to comply with the 1947 Act with which she and her attorney were apparently familiar.
 
 
 32
 Thus, if plaintiff knew she was to deliver or was delivering an "invalid" deed, she had a duty, if the transaction was in good faith, to advise the buyer of her inability to perform the contract. It was the seller's duty to reveal that she could not perform under the contract, that she was unable to deliver a valid deed, as she now asserts. It is not a title defect or a cloud on the title, which frequently occurs, which can be accepted or waived by acceptance of the title as shown by an abstract. It is instead a fundamental matter relating to seller's ability to perform, to deliver title at all, or title to a substantial undivided interest. It is obvious that the buyer, after the abstract had been examined, knew that the plaintiff was a Creek Indian and that the property had been inherited; nevertheless he was not aware of seller's inability, as she now contends, to deliver a valid deed. It makes no difference for these purposes whether this was a fact or legal matter.
 
 
 33
 The parties have presented the issue as to the nature of plaintiff's title under the 1947 Act, after the exchange of deeds with her brothers. As mentioned above, there were no restrictions on the interests in the hands of plaintiff or her brothers as these had expired on their father's death. The two-thirds interest she acquired from her brothers was not restricted "in the hands of the person from whom (plaintiff) acquired same." See Act of August 4, 1947, § 1(a). There is no issue present as to a change in restrictions by a partition as there were then no restrictions. After the title was acquired by plaintiff, the 1947 Act sought to impose restrictions not theretofore present on certain kinds of estates, basically estates of inheritance, not of purchase. The inquiry then is whether the title in plaintiff comes within the description of interests sought to be covered by the Act.
 
 
 34
 In Boyd v. Weer, 122 Okl. 91, 253 P. 988, the State Supreme Court considered a situation where two Creek Indian brothers who had inherited undivided interests exchanged quit-claim deeds. The court held that each of the heirs after the exchange of deeds held their interest acquired by the exchange as an estate acquired by purchase. We hold that these cases are determinative of the issue and thus the plaintiff took one-third of the land by inheritance of the type covered by the Act of 1947 and two-thirds by purchase and thus not covered by the Act. We must again emphasize that exchange of deeds, the "partition" in no way affected a then present restriction, but the consequence was that her original interest was acquired by inheritance and the two-thirds was by purchase from her brothers. Congress in 1947 only intended to reach interests acquired by inheritance; the wording is clear.
 
 
 35
 In our prior opinion we considered a preliminary injunction against proceedings in the Oklahoma County Court. The question was whether the county court could, at this late date, grant approval to the deed in question under the 1947 Act over the objection of the plaintiff. The trial court denied the preliminary injunction and we reversed, holding that the county court proceeding could not continue over plaintiff's objections.
 
 
 36
 We agree with the application of the doctrine of laches to the claim of the plaintiff as made by the trial court, and agree with the analysis of the law as made by that court as to laches.
 
 
 37
 As the authorities clearly demonstrate, the Indians of the Five Civilized Tribes have been dealt with by Congress separately and differently from other Indians. Thus the decisions which concern Indians who are under the General Allotment Act (25 U.S.C.A. § 331) are not helpful nor are they applicable. The Field Solicitor so testified in this action. See Semple, Oklahoma Indian Land Titles, Annot., § 730.
 
 
 38
 Mr. W. F. Semple made a statement and answered questions on May 2, 1947, during the House hearings on H.R.3173 which became the Act of August 4, 1947. He had then been practicing law in the Choctaw area of Oklahoma for some forty years. He there stated that the Act under consideration was to stabilize titles of the Five Civilized Tribes. He referred to the 1933 Act and the confusion arising there from restrictions on the half blood and the full blood, and the distinctions between tax exempt and other lands. Mr. Semple was a Choctaw Indian, he was attorney for the Tribe, was also or had been Chief of the Tribe, as were his grandfather and great-grandfather. Congressman Stigler also made a statement at the same hearing. He said in part, after referring to the confused state of Indian titles: "The whole purpose of this bill is to stabilize and settle once and for all, all those questions of doubt which now exist . . ." Congressman Stigler was an enrolled Choctaw and had practiced law, specializing in Indian land titles since 1920.
 
 
 39
 Thus we must apply the 1947 Act so as to attain its purpose, and also apply the Act of 1926, hereinafter further considered, to accomplish the same end insofar as it is possible.
 
 
 40
 It would not seem necessary to describe at length the elements of laches as we described the doctrine in Socony Mobil Oil Co. v. Continental Oil Co., 335 F.2d 438 (10th Cir.), and in Alexander v. Phillips Petroleum Co., 130 F.2d 593 (10th Cir.). The text books further describe the elements. As to the time period used in the application of the doctrine of laches, it is, of course, of secondary importance. The court in the proper case applies laches although the period of time may be much shorter than provided in a statute. See Pomeroy, Equity Jurisprudence § 419b. It is sufficient to say that all the elements for the application of the doctrine of laches are present. We thus agree with the trial court that the delay of over eight years with knowledge of the facts and law and with reliance by defendants on the deed, the creation of substantial improvements, and the detriment by reason of the delay are more than sufficient to require the application of the doctrine.
 
 
 41
 By the Act of April 12, 1926, § 2, 44 Stat. § 240, Congress made the Oklahoma state statutes of limitation applicable to Indians of the Five Civilized Tribes. It expressly so placed them in the same position as ". . . any other citizen of the State of Oklahoma, and may be pleaded in bar of any action brought by or on behalf of any such Indian, his or her heirs or grantees, either in his own behalf or by the Government of the United States, or by any other party . . ." The Act was so applied by this court in Wolfe v. Phillips, 172 F.2d 481 (10th Cir.), and there the holding is that the law of the state is applicable. The law of the state is applied whatever it may be from time to time. Congress left the period of time under the statute entirely up to the state and set none itself nor did it adopt any time period. See also Seitz v. Jones, 370 P.2d 300 (Okl.). It is obvious that Congress considered it necessary to place these persons on the same footing as non-Indians in Oklahoma to require the prompt assertion of claims and filing of causes of action. Periods of limitation are of long standing as a practical and necessary device to require, regardless of what may be the equities of the situation, that persons make known, and take formal action to assert claims or rights they may have. It is also apparent that the doctrine of laches follows a parallel course, but with greater emphasis on the defendant's position, and without the requirement of the passage of a specified time. Thus we hold that the Act of 1947 in its application of Oklahoma law of limitations also included the Oklahoma doctrine of laches as it applied to all citizens. The two matters are not separable and for Congress to accomplish its purpose, both limitations and laches must be applied.
 
 
 42
 We have held on several occasions that the construction of a federal statute is a matter of federal law. Johnson v. United States, 64 F.2d 674 (10th Cir.); Jefferson v. Gypsy Oil Co., 27 F.2d 304 (8th Cir.).
 
 
 43
 The Oklahoma state statutes of limitation are applicable not as part of the federal law but as state law. The parallel doctrine of laches in Oklahoma is to be derived also from the consequences of the federal act, and should be applied by the federal courts also as part of the state law rather than as federal law. Thus Congress directed the application of Oklahoma statutes of limitation as they may exist from time to time and as applicable to non-Indians. The parallel doctrine of laches also is applicable in the same way, as we have above set forth.
 
 
 44
 The Act of 1926 is not unique as Congress passed a similar Act in 1902 (Act of May 31, 1902, 32 Stat. 284). This Act was applied in Beaver v. Cowan, 104 Okl. 63, 230 P. 251, where the court applied the limitations in section 4471 of Mansfield's Digest of the Statutes of Arkansas. This Act of 1902 applied to all Indians.
 
 
 45
 Also Congress made certain Oklahoma statutes relating to guardianships applicable to members of the Five Civilized Tribes. Of these statutes the Court in Stewart v. Keyes, 295 U.S. 403, 55 S.Ct. 807, 79 L.Ed. 1507, said: "The(se) laws remained state laws, as before, and as such were to be applied to these Indians." The Court held that whether procedures complied with the guardianship laws was a matter of state law, not federal law. The Court there also considered a portion of the Act of 1926.
 
 
 46
 Thus the application of state laws to Indians of the Five Civilized Tribes is not unusual and state laws have been applied in a number of cases by the federal and state courts, in addition to those herein cited. The purpose of Congress in enacting the Act of 1926 is clear as the necessity to require the prompt litigation of claims relating to real estate had become apparent. The statutes of limitation are for the most part arbitrary in their application. Laches is the comparable device to prevent the assertion of stale claims in equitable proceedings. See Alexander v. Phillips Petroleum Co., 130 F.2d 593 (10th Cir.), and Hoehn v. Crews, 144 F.2d 665 (10th Cir.). The consequences of the two are basically the same. Laches is strictly a matter of defense and is not and cannot be used to affirmatively establish a claim. It is strictly a defensive measure to meet a situation where the moving party is advancing an inequitable claim. It cannot really be disassociated from the statutes of limitation in its purposes and consequences. It must be held that Congress also intended this doctrine to be included within the Act relating to limitations.
 
 
 47
 The equitable modification or variation applied to statutes of limitation is illustrated in Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743, where the Court applied equitable principles to the application of state statutes of limitation. This decision obviously relates to federally created rights of action, but the reasoning is persuasive here.
 
 
 48
 We find nothing in the decisions of the courts of Oklahoma which would prevent or cast doubt on the application of laches to the circumstances before us. The parties have treated at length the several state decisions.
 
 
 49
 Of the several cases urged by appellant on this point of laches, only Hampton v. Ewert, 22 F.2d 81 (8th Cir.), and Haymond v. Scheer, 543 P.2d 541 (Okl.), treated the issue of laches and neither concerned a member of the Five Civilized Tribes. The plaintiff relies also on Smith v. Williams, 78 Okl. 297, 190 P. 555, but this decision was handed down in 1920 and hence before the Act of 1926.
 
 
 50
 As we have indicated above the result or consequences of the application of statutes of limitation on the transactions of the type with which we are here concerned is no different from the application of the doctrine of laches. The arguments of appellant relating to the consequences thus apply equally to the statutes of limitation and have been already answered by Congress.
 
 
 51
 On the matter of laches, we must again refer to the purchase by plaintiff and her husband of the land from Amos Beaver, a Creek Indian, for a new house. The contract was entered into about two days before the deed was delivered by plaintiff to Becko. There may have been some confusion as to the application of the 1933 Act to half bloods and full bloods, but the contract with Amos Beaver required that the deed from him to the plaintiff be approved by the county court. It was so approved and the petition and proceedings were handled by plaintiff's attorney, Mr. Petrik. These contract requirements were discussed by him with the plaintiff.
 
 
 52
 The plaintiff also urges that the Supplemental Creek Treaty is involved if laches are applied. However, any restrictions on the application of estoppel have long since expired and we must conclude that the treaty is in no way involved.
 
 
 53
 The judgment of the trial court is affirmed as to all relief granted defendants insofar as such relief pertains to the two-thirds interest in the subject property which the plaintiff acquired from her brothers, but so affirmed for the reasons hereinabove set forth. The judgment of the trial court is affirmed, again for the reasons herein set forth, as to the one-third interest plaintiff acquired from her father, but only insofar as it directs the dismissal of plaintiff's complaint, and not as to affirmative relief granted to defendants.
 
 McKAY, Circuit Judge, dissenting:
 
 54
 I question our conclusion that two thirds of the appellant's interest in the land had been acquired by purchase, rather than by inheritance. On this point, Oklahoma law is determinative. While Oklahoma case law is not absolutely free from ambiguity, I believe it takes a view inconsistent with that of today's opinion.
 
 
 55
 Oklahoma cases have clearly held that a partition among cotenants does not amount to a change in title, but merely adjusts the rights of possession. In re Estate of Mullendore, 297 P.2d 1094, 1096 (Okl.1956) (per curiam). It does not transform an inherited estate into one of purchase. In re Moran's Estate, 174 Okl. 507, 51 P.2d 277, 279 (1935) (per curiam). The rule is the same regarding the partition of restricted Indian lands. In re Pryor's Estate, 199 Okl. 17, 181 P.2d 979, 984-85, cert. denied, 332 U.S. 816, 68 S.Ct. 155, 92 L.Ed. 393 (1947).
 
 
 56
 Whatever ambiguity may be said to exist in this area stems from two decisions of apparently contrary implication. Our analysis in United States v. Hale, 51 F.2d 629 (10th Cir. 1931) is inconsistent with the above stated rule, but that analysis was criticized as contrary to Oklahoma law in In re Pryor's Estate, 199 Okl. 17, 181 P.2d 979, 984, cert. denied, 332 U.S. 816, 68 S.Ct. 155, 92 L.Ed. 393 (1947).
 
 
 57
 The case of Boyd v. Weer, 124 Okl. 91, 253 P. 988 (1926) (per curiam) also appears to be in conflict with the inheritance rule. In that case the court regarded an exchange of undivided interests between Indian cotenants as a sale. But the court's analysis was influenced by the fact that the exchange occurred prior to the Act of Congress of June 14, 1918 an Act providing for the partition of restricted Indian lands. The court was of the view that such a partition was unavailable prior to the enactment. 253 P. at 990. Boyd is therefore distinguishable from Oklahoma cases following the general rule. More to the point, it is distinguishable from In re Pryor's Estate, a case applying the general rule to a post-1918 partition of Indian lands.
 
 
 58
 In addition to dissenting on the acquisition by purchase issue, I wish to express my concerns about engrafting the doctrine of laches onto the Act of August 4, 1947. While I have no doubt about the correctness of our equitable evaluation, I am not certain the statute we are dealing with leaves room for such equitable considerations.
 
 
 59
 In the Act of August 4, 1947, Congress provided that
 
 
 60
 no conveyance, including an oil and gas or mineral lease, of any interest in land acquired before or after the date of this Act by an Indian heir or devisee of one-half or more Indian blood, when such interest in land was restricted in the hands of the person from whom such Indian heir or devisee acquired same, shall be valid unless approved in open court by the county court of the county in Oklahoma in which the land is situated . . . .
 
 
 61
 Pub.L. No. 80-336, § 1, 61 Stat. 731 (emphasis added). The words seem to be absolute: "no conveyance . . . shall be valid unless approved in open court." The effect of today's decision is to make just such a conveyance valid.
 
 
 62
 The majority finds support for its invocation of laches in the Act of April 12, 1926, Pub.L. No. 69-98, 44 Stat. 239. It is true that Congress, in Section 2 of that Act, made Oklahoma limitations statutes applicable to the Civilized Tribes. In an appropriate case, such a statute would be assertable to bar an Indian's claim that an unapproved transfer is invalid. But such a result has been legislated by Congress. Today's rule has been promulgated by this court.
 
 
 63
 The majority suggests that the same Congressional purpose behind applying limitations statutes to the Civilized Tribes supports invocation of the doctrine of laches in this case. It is true, of course, that both laches and limitations statutes seek to bar stale claims. What the majority does not stress is the difference between the two in terms of which stale claims each is designed to bar. Limitations statutes are focused on the mere passage of time. By contrast, the doctrine of laches focuses on the effect of time's passage. Not much time need pass to justify the doctrine's invocation. What is essential to laches is that the plaintiff's failure to assert his rights has caused prejudice to the defendant and that equity now disfavors the plaintiff. In essence, a balancing of equities is called for. The doctrine of laches thus has conceptual underpinnings quite different from those of a limitations statute. I therefore do not think it is correct to suggest that by merely authorizing application of limitations statutes, Congress intended that the doctrine of laches would be invoked as well.[1]
 
 
 64
 Even if laches and limitations statutes could be said to have the same conceptual underpinnings, I would be hesitant to agree that this court should adopt what amounts to an amendment of the 1926 Act. Had Congress desired to permit equitable defenses to be raised against Indian assertions of transfer invalidity it surely could have done so. A Congressional intent to permit such defenses is, at best, rather obliquely suggested in the 1926 Act. Absent such an expression of intent, I do not think we have the authority to fashion today's remedy.
 
 
 65
 Aside from these more technical considerations, I am troubled by the implications of our decision. It is beyond question that Congress imposed alienation restrictions on Indian lands to protect those Indians who might otherwise lose their property through disadvantageous real estate transactions. E. g., 1 Hearings on H.R.3173 Before the Subcomm. on Indian Affairs of the House Comm. on Public Lands, 80th Cong., 1st Sess. 43 (May 2, 1947) (statement of Rep. Albert). In the face of considerable contrary authority,[2] we have opened the door to equitable avoidances of these Congressionally imposed protections. In doing so, I fear that we may be frustrating Congressional purposes and endangering Indian lands. While the equities of this particular case are not in favor of the plaintiff,[3] it does not require much creativity to imagine a scenario in which the equities are extremely close but where the trial court has made a judgment against an Indian. We might then be barred by the clearly erroneous test from reaching another result. When this occurs, the damage Congress sought to avoid by imposing alienation restrictions will have been done.
 
 
 66
 Today's opinion upholds a transfer of title that is void under the Act of August 4, 1947. The opinion is troublesome because it transforms the near-absolute protection[4] of the Act into a protection dependent on the potential effervescence of equitable balancing. Because I question our authority to make this transformation, and because the transformation seems to be inconsistent with the purpose of the alienation restrictions, I respectfully dissent.
 
 
 
 [1]
 The majority opinion emphasizes the title stabilizing purpose of the 1947 Act. It seems to me, however, that invocation of the laches doctrine could have a destabilizing effect on title, inviting, as it would, litigation over titles that would be avoided by strict adherence to the requirement that alienation can occur only with court approval. Laches can only be determined in a court battle. Until the battle's outcome is clear, the title will not be
 
 
 [2]
 The majority refers to no judicial authority supportive of its position. In contrast, several cases have expressed hostility to equitable evasions of alienation restrictions. E. g., Hampton v. Ewert, 22 F.2d 81, 92 (8th Cir. 1927), cert. denied, 276 U.S. 623, 48 S.Ct. 303, 72 L.Ed. 737 (1928); Haymond v. Scheer, 543 P.2d 541, 545 (Okl.1975); Naharkey v. Sand Springs Home, 177 Okl. 371, 59 P.2d 289, 292-93, cert. denied, 299 U.S. 588, 57 S.Ct. 118, 81 L.Ed. 433 (1936); Scott v. Dawson, 175 Okl. 550, 53 P.2d 538 (1936); Smith v. Williams, 78 Okl. 297, 190 P. 555 (1920)
 Perhaps the most articulate rejection of such equitable exceptions appeared in Smith v. Williams, 78 Okl. 297, 190 P. 555, 557 (1920):
 The right on the part of an Indian to alienate his land, and the right on the part of any person to purchase such land and to acquire valid title thereto is peculiarly and strictly a statutory right created by acts of Congress, and which right is not possibly available except through the means which Congress has prescribed, for Congress has expressly said that any attempt to acquire such rights, except through the means prescribed by Congress, shall be absolutely null and void. Therefore title to restricted Indian land cannot be acquired from the allottee upon equitable grounds.
 While Smith involved the consideration of an alienation restriction provision antedating that of the 1947 Act, its rationale remains relevant. The right to alienate Indian lands remains one of Congressional origin.
 The majority distinguishes Smith because it was decided prior to the statute of limitations provision of the 1926 Act, suggesting that Oklahoma courts would no longer take this approach. Because I believe Congress has not provided for assertion of equitable defenses in the 1926 Act, I do not believe the Oklahoma courts, any more than this court, have authority to so provide on their own contrary to the statute. In any event, I note that principles similar to those of Smith have recently been upheld in an Oklahoma decision dealing with non-Civilized Tribes. Haymond v. Scheer, 543 P.2d 541, 545 (Okl.1975). Furthermore, Smith itself has been cited in a post-1926 decision for the proposition that estoppel principles cannot be employed to validate a conveyance otherwise invalid for violation of alienation restrictions. Scott v. Dawson, 177 Okl. 213, 58 P.2d 538, 541-42 (1963).
 
 
 [3]
 It is not disputed that plaintiff received a fair price for the land, that she had legal counsel in connection with the sale, and that she had some awareness at the time of sale that Indian land transactions can require court approval. In addition, the defendants have invested considerable sums of money in the lands obtained from the plaintiff. There is no question that the return of the lands to the plaintiff would result in great economic losses to defendants. Without minimizing the harshness of the result, I wish to point out that the result is not without parallel in the law. Courts countenance similar occurrences by allowing infants to be relieved from contractual obligations. E. g., Burnand v. Irigoyen, 30 Cal.2d 861, 186 P.2d 417 (1947); Doenges-Long Motors, Inc. v. Gillen, 138 Colo. 31, 328 P.2d 1077 (1958) (en banc)
 
 
 [4]
 Application of limitations statutes admittedly makes the protection less than absolute