**Vincent K. KNOX, et al., Plaintiffs,**

**v.**

**MILWAUKEE COUNTY BOARD OF ELECTIONS COMMISSIONERS, et al., Defendants.**

**No. 83–C–2039.**

United States District Court, E.D. Wisconsin.

Feb. 17, 1984.

Richard Congdon, Waukesha, Wis., for plaintiffs.

George E. Rice, Acting Corp. Counsel, Milwaukee, Wis., for defendants.

## DECISION AND ORDER

WARREN, District Judge.

### Background

On December 30, 1983, plaintiffs, four black and two Hispanic residents of Milwaukee County, filed their complaint in this action, alleging violations of Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 (1983), and 42 U.S.C. § 1983 (1981), for deprivations of rights secured under the Fourteenth and Fifteenth Amendments to the United States Constitution. In their complaint, plaintiffs charge that a reapportionment plan adjusting the various boundaries of Milwaukee County supervisory districts consistent with 1980 census statistics unlawfully dilutes black and Hispanic voting strength, thus denying members of those minority

groups an equal opportunity to participate in the political process and to elect candidates of their choice to public office.

In addition to their request for judgment declaring the redistricting plan unlawful, plaintiffs also seek preliminary and permanent injunctive relief, restraining the implementation and enforcement of the plan and enjoining all primary and general elections conducted pursuant to it. Finally, plaintiffs request that the Court "[o]rder into effect a plan for the election of members of [the] Milwaukee County Board of Supervisors which provides plaintiffs and those similarly situated with a remedy for the violation of their rights as described ... [in the complaint]." Plaintiffs' Complaint at 5 (December 30, 1983).

Named as defendants in the complaint are the Milwaukee County Board of Elections Commissioners; Josephine E. Ervin, Jerome Morse, and William Seelow, as members of that Commission; William F. O'Donnell, as Milwaukee County Executive; and the Milwaukee County Board of Supervisors. It was the action of the Board of Supervisors and the County Executive in passing and approving the reapportionment plan in late February and early March of 1982 that forms the basis of the present suit.

Filed with their complaint on December 30, 1983, was plaintiffs' motion for a preliminary injunction, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, to restrain the defendants from conducting elections under the challenged redistricting plan. In support of that motion, plaintiffs have submitted a brief, describing, among other things, the nature of the irreparable injury they claim they will suffer if elections under the plan are not enjoined, and an affidavit of one of the plaintiffs, Vincent K. Knox, stating that the redistricting plan has the effect of diluting the voting strength of both the black and Hispanic communities in Milwaukee County.[1]

---

**1.** By their motion for preliminary relief and in their supporting brief and affidavit, plaintiffs also raise, apparently for the first time, the claim that Milwaukee County's 1982 reappor-

tionment plan works a violation of the Nineteenth Amendment to the Constitution, which establishes that the rights of citizens to vote "shall not be denied or abridged by the United

On January 12, 1984, the defendants filed their response to plaintiffs' motion, outlining the reapportionment process currently prescribed by Wis.Stat. § 59.03(2)(a) (1982), and arguing, based on an extensive discussion of the case law in this area, that there has been no violation of either the Voting Rights Act or of the Fourteenth and Fifteenth Amendments to the Constitution, in connection with the passage of Milwaukee County's 1982 redistricting plan. With respect to the applicability of the Voting Rights Act itself, the defendants argue against the constitutionality of the 1982 amendment under which this action is brought, suggest that plaintiffs must exhaust all administrative remedies before suing in federal court, and question whether Milwaukee County is among those jurisdictions and political subdivisions to which the Act was intended to apply.

Defendants further maintain that plaintiffs have not met their burden of demonstrating an entitlement to injunctive relief under Rule 65(a), that the doctrine of laches stands as a considerable barrier to their petition for an injunction, regardless of its merits, and that the Milwaukee County Board of Supervisors is not a proper defendant since the individual members of that Board have not been served personally.[2] In support of their various arguments, defendants have filed the affidavit of F. Thomas Ament, the Chairman of the Milwaukee County Board of Supervisors. The thrust of that affidavit, which describes in detail the process through which the challenged reapportionment plan was developed, is that the boundaries of the 25 supervisory districts were not drawn to dilute the voting strength of any ethnic group but represent instead the best efforts of those involved to equalize the populations of the various districts to ensure that each includes approximately 38,600 residents.

On January 17, 1984, plaintiffs filed a reply brief, maintaining that the Voting Rights Act as amended plainly applies to the present case, that a violation of the Act has been made out, that the authority cited by opposing counsel with respect to the constitutional dimension of the complaint is distinguishable, and that the doctrine of laches does not prevent the Court from enjoining the county elections.

One day later, on January 18, 1984, the defendants filed their answer to the underlying complaint in this case, denying all substantive allegations against them and raising six affirmative defenses—among them, that the Milwaukee County Board of Supervisors is not sui juris, that Section 2 of the Voting Rights Act as amended is unconstitutional and does not apply to the redistricting plan developed throughout 1981 and passed in early 1982, that plaintiffs have failed to exhaust their administrative remedies, and that they are guilty of laches and thus undeserving of the equitable relief they seek.

On January 20, 1984, the Court began what developed into a three-day hearing on plaintiffs' motion for a preliminary injunction. During the course of those proceedings, the Court heard testimony from no fewer than eight witnesses, including plaintiff Vincent K. Knox and County Board Chairman F. Thomas Ament. It also re-

States or by any State on account of sex." Plaintiffs have not, however, pursued this alleged violation of the Nineteenth Amendment as vigorously as they have argued their companion claims under the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act as amended.

**2.** In addition, the defendants originally noted in their brief that plaintiffs had failed to serve the Wisconsin Attorney General with a copy of the proceeding in this case, as required under Wis. Stat. § 806.04(11) (1982). During the course of a conference call between Court and counsel on January 11, 1984, plaintiffs' attorney confirmed

that he had, in fact, recently served the Attorney General, and defense counsel thus withdrew his argument in this regard.

In the wake of this confirmation, the Court, by its letter of January 13, 1984, formally notified the Attorney General that he would be afforded an opportunity to be heard on plaintiffs' Rule 65(a) motion and given the opportunity to file a memorandum of law on the constitutional challenge it raises. On January 19, 1984, the Court received a response from Assistant Attorney General Daniel D. Stier, advising that the Attorney General would not become actively involved in this matter at its present stage.

ceived into evidence some fourteen exhibits, ranging in nature from detailed maps of the present and former supervisory districts to a copy of the 1980 census tracts for the metropolitan Milwaukee area. In addition, the Court entertained some rather extensive opening arguments from counsel on the various legal issues presented in their briefs previously filed.

In the two weeks since the conclusion of those proceedings, the parties have submitted post-hearing memoranda of law, in which they summarize the evidence in support of their respective positions and address again the principal legal issues raised by plaintiffs' petition for injunctive relief— namely, whether the Court has jurisdiction over the Milwaukee County Board of Supervisors, whether the doctrine of laches is properly invoked here to deny the preliminary injunction motion, and whether Section 2 of the Voting Rights Act as amended has any application to the present case. With respect to the third issue, defense counsel further articulates in his brief an argument he raised for the first time at the hearing—that is, that the amendment to Section 2 upon which plaintiffs' case proceeds cannot be applied retrospectively to invalidate a plan approved four months prior to the passage of the amendment. Plaintiffs, of course, disagree with this conclusion and cite some authority for the position that the Voting Rights Act as amended was intended to apply to pending cases.

The Court has painstakingly reviewed the considerable evidence adduced both in support of and in opposition to the plaintiffs' request for injunctive relief. It has also carefully considered the several arguments presented by the parties in their thorough briefs. Based on this analysis, the Court is now convinced that the motion for a preliminary injunction pursuant to Rule 65(a) must be denied on the basis that the defendants have established a valid defense of laches to plaintiffs' request for injunctive relief.

### The Defense Of Laches To Plaintiffs' Request For Injunctive Relief

The doctrine of laches was developed by chancellors of equity to prevent the assertion of stale claims and to remedy an injustice that arose from the fact that a statute of limitations ordinarily applicable to a legal right did not apply to an equitable remedy. *Environmental Defense Fund, Inc. v. Alexander,* 614 F.2d 474, 478, *rehearing denied,* 616 F.2d 568 (5th Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980); *Equal Employment Opportunity Commission v. Dresser Industries, Inc.,* 668 F.2d 1199, 1201 (11th Cir.1982). In order for the doctrine of laches to apply today, the defendant must demonstrate both an inexcusable delay by the plaintiff in asserting his or her rights and some undue prejudice to the defendant as a result. *Lingenfelter v. Keystone Consolidated Industries, Inc.,* 691 F.2d 339, 340 (7th Cir.1982); *Rozen v. District of Columbia,* 702 F.2d 1202, 1203 (D.C.Cir.1983).

One of the primary elements in determining when delay is excusable is whether the party against whom the doctrine of laches is being asserted had knowledge of the facts giving rise to his cause of action. *Matthews v. United States,* 526 F.Supp. 993, 999 (M.D.Ga.1981), *aff'd in part and rev'd in part on other grounds,* 713 F.2d 677 (11th Cir.1983); *Armstrong v. Maple Leaf Apartments, Ltd.,* 436 F.Supp. 1125, 1149 (N.D.Okl.1977), *aff'd in part,* 622 F.2d 466 (10th Cir.1979), *cert. denied,* 449 U.S. 901, 101 S.Ct. 271, 66 L.Ed.2d 131 (1980). In this context, a plaintiff confronted with the laches defense is chargeable with knowledge not only of those facts known to him at the time, but also of facts which he could have learned by means of an inquiry pursued with reasonable diligence. *Anaconda Company v. Metric Tool & Die Company,* 485 F.Supp. 410, 427 (E.D.Pa.1980); *Ward v. Ackroyd,* 344 F.Supp. 1202, 1212 (D.Md.1972).

Precisely what constitutes an unreasonable or inexcusable delay for purposes of the laches doctrine varies with the facts and circumstances of each case. *Car-*

*lo v. Gustafson,* 512 F.Supp. 833, 837 (D.Alaska 1981); *Dalsis v. Hills,* 424 F.Supp. 784, 788 (W.D.N.Y.1976). As a general rule, the determination of unreasonableness should focus on the length of the delay and the reasons for it, how the delay affected the defendant, and the overall fairness in permitting the assertion of the claim. *Goodman v. McDonnell Douglas Corporation,* 606 F.2d 800, 806 (8th Cir.1979), *cert. denied,* 446 U.S. 913, 100 S.Ct. 1844, 64 L.Ed.2d 267 (1980); *Citizens and Landowners Against the Miles City/New Underwood Powerline v. Secretary of the Department of Energy,* 683 F.2d 1171, 1174 (8th Cir.1982).

 Finally, prejudice in the laches context is signaled by a disadvantage in asserting and establishing a claimed right or defense or some other harm caused by detrimental reliance on the plaintiff's conduct. *Pegues v. Morehouse Parish School Board,* 632 F.2d 1279, 1283 n. 5 (5th Cir. 1980), *cert. denied,* 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 844 (1981), *appeal after remand,* 706 F.2d 735 (5th Cir.1983); *Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 844 (D.C.Cir.1982). The determination as to the existence of this and all other elements of the laches defense is left to the sound discretion of the trial court, and its decision in this regard will not be set aside absent a clear abuse of that discretion. *Watkins v. Northwestern Ohio Tractor Pullers Association, Inc.,* 630 F.2d 1155, 1163 (6th Cir. 1980); *Lamelson v. Carolina Enterprises, Inc.,* 541 F.Supp. 645, 657 (S.D.N.Y.1982).

 Applying these standards to the present case, it is clear that defendants have established a valid defense of laches. As Mr. Ament described in his testimony at the hearing on plaintiffs' motion, the process through which the 1982 redistricting plan was developed began as early as March of 1981, with the appointment of a seven-member reapportionment committee, and continued throughout the following twelve months. In early 1981, the committee staff began to assemble data for use in formulating a constitutionally-valid plan and, in this connection, undertook efforts through the media to notify county residents of the studies being conducted.

In the weeks ahead, the staff processed census data for Milwaukee County from both the United States Census Bureau and the Southeastern Wisconsin Regional Planning Commission (SEWRPC), assembled and made public population counts for the several supervisory districts, and prepared maps for use in the development of a county-wide redistricting plan. As Mr. Ament testified, nearly all of this was conducted in a manner intended to facilitate inquiry from interested county residents.

By public notice of April 3, 1981, then County Supervisor Thomas P. Kujawa advised the press and "all interested citizens" that the Special Committee on Reapportionment would hold an organizational meeting on April 13, 1981, at which the redistricting proposals of interested parties would be considered. At that meeting, a motion to draft a tentative redistricting plan was unanimously adopted, and, in the three weeks immediately following, the staff submitted minor amendments to the work in progress, at the requests of Supervisors Penny Podell and Thomas Kujawa. It also compiled data on the approximate number of minorities per district, as requested by Supervisor Terrence Pitts.

On May 4, 1981, a second public meeting of the Special Committee on Reapportionment was held, this time to consider a staff report on the tentative plan. During both that meeting and one held on May 11, 1981, at which the tentative plan was approved, county residents were afforded an opportunity to be heard.

The tentative plan was approved by the full County Board of Supervisors on May 12, 1981. Although county residents had been informed that amendments or alternative proposals would be considered, none was offered, and the tentative plan passed and was signed by the County Executive in the form recommended by the reapportionment committee.

Pursuant to Wis.Stat. § 59.03(2)(a) (1982), the clerk then forwarded the tentative plan to the nineteen municipalities in the county in order for them to adopt ward lines and prepare comments on the redistricting proposal. From June through December of 1981, the municipalities submitted their responses to the tentative plan, and, on February 9, 1982, the county staff advised the reapportionment committee that based on its review of the ward lines adopted by the municipalities, the plan could be adopted as originally approved, with only two minor changes.

On February 15, 1982, the Special Committee on Reapportionment conducted yet another public hearing to consider adoption of the final plan. According to the minutes of that meeting attached as an exhibit to Mr. Ament's affidavit of January 16, 1984, the committee heard from two members of the public, one expressing opposition to the plan on behalf of the Black Woman's Network Milwaukee Forum, and the other voicing the support of the League of Women Voters. Beyond these remarks, no alternative plan was recommended or substitute proposal submitted.

Three days later, upon the recommendation of the reapportionment committee, the final redistricting plan was passed by the full County Board of Supervisors. County Executive William O'Donnell approved the plan on March 12, 1982, effective December 1, 1983. According to Mr. Ament's testimony, no legal challenge to the reapportionment was made until the present action was filed on December 30, 1983, just one working day before all nomination papers were to be filed, and just seven weeks before the primary election of February 21, 1984, four days from now.

Under this set of facts, the Court can only conclude that plaintiffs' request for preliminary relief, made some 31 months after the approval of the tentative proposal and 22 months after the adoption of the final plan, is inexcusably delayed. The Court has already noted the efforts made by the Milwaukee County Board of Supervisors and its Special Committee on Reap-

portionment to enlist the counsel and solicit the contribution of county residents at nearly all stages of the plan's development. In this context, the committee's interest in ensuring that the final reapportionment of population among the 25 supervisory districts represents the best efforts of both elected officials and the public they represent cannot be questioned. The considered testimony of Mr. Clarence Johnson, Legislative Research Analyst for Milwaukee County, and of Mr. Glenn E. Bultman, Director of County Board Services, stands in strong support of this conclusion.

Plaintiffs' apparent decision not to participate actively at any time during that deliberative process nor to challenge its results until the present campaign had begun precludes them from securing the injunctive relief they now seek. In short, the Court opines that plaintiffs have shown a lack of diligence in asserting their claim in this most untimely fashion and that defendants would be prejudiced indeed if the upcoming elections were enjoined.

Admittedly, plaintiff Knox testified that he was not aware of the Milwaukee County Board's 1982 reapportionment plan until August or September of 1983, that he did not recognize the discriminatory nature of the redistricting until he campaigned as a candidate for county supervisor in a special election in the fall of last year, and that, for political reasons, he refrained from bringing the present action until the results of that election were known. Consistent with this testimony, plaintiffs' counsel argues that the defense of laches cannot be invoked against one whose knowledge of the discrimination against him is only recently acquired and who thereafter promptly seeks a judicial remedy.

The apparent flaw in this reasoning as it applies to plaintiff Knox is that he describes himself as a political consultant with some considerable experience in managing campaigns for various elective offices in the Milwaukee area. Indeed, he was recently a deputy campaign manager for one of the candidates in the special election for the Fourth Congressional Dis-

trict and is presently advising a candidate for one of the seats on the Milwaukee County Board of Supervisors. Given his experience and apparent familiarity with county government elections, the Court has no difficulty in concluding that plaintiff Knox, even if he had no knowledge of the allegedly discriminatory effect of the redistricting plan until the fall of 1983, could have learned of the facts upon which his present claim is based by means of some limited investigation or inquiry with the County Board's Special Committee on Reapportionment. Pursued with reasonable diligence, plaintiff's efforts in this regard could have readily produced the sort of information about which he testified so thoroughly at last month's hearing.

As to the other five plaintiffs in this case, about whose political background and insight into the electoral process the Court can only speculate, the continuing efforts of the reapportionment committee and its staff to notify interested segments of the population of the redistricting procedure should have proved sufficient to alert them to the possibility that shifts in boundary lines were likely. While the Court appreciates plaintiffs' present interest in ensuring the legality of the upcoming county elections, it is forced to conclude that their efforts to purge the process of any discriminatory element are untimely.

Moreover, the prejudice the defendants and, indeed, all Milwaukee County residents would suffer if plaintiffs' motion were granted is undeniable. As Mr. Ament testified, an injunction stopping the supervisory elections at this time would have two nearly catastrophic effects. First, it would have a devastating impact on the electoral process itself. As the Court has already observed, nomination papers for all 25 supervisory districts have already been filed and the campaign itself has been underway for nearly two months. In this regard, candidates' election reports have been filed, campaign committees organized, contributions solicited, and literature distributed. In addition, the Milwaukee County Board of Election Commissioners has itself prepared absentee ballots, distributed

informational publications and notices, and undertaken to comply with the myriad of other election requirements prescribed by state law. An order enjoining the elections at this late date would thus result in considerable prejudice to the defendants, the candidates, and the electorate itself.

Even more significantly, an injunction would, by April of this year, render county government impotent, as the terms of office of the present supervisors expire and no elected officials replace them. As defendants established at the hearing on plaintiffs' motion, county government provides important social services to thousands of residents on a daily basis. Absent a legislative branch to authorize the expenditure of funds to sustain these services and to ensure their efficient administration, these individuals would not be provided the assistance they need.

The prospect of thousands of Milwaukee County residents going unprovided for, coupled with the certain disenfranchisement of nearly one million voters, convinces the Court that the prejudice created by an injunction here would be of the highest magnitude. Under these circumstances, the Court feels justified in exercising its discretion to deny plaintiffs' motion.

In actions like the present to enjoin elections scheduled for the immediate future, the equitable power of the courts to recognize and implement a valid defense of laches is well established. Perhaps the best articulation of this power is found in the United States Supreme Court's decision in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), a case in which voters in several Alabama counties sought, among other things, an injunction against future elections for the state legislature, pending reapportionment in accordance with the Alabama constitution. Writing for the Court, Chief Justice Warren observed:

[U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective re-

lief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree. As stated by Mr. Justice Douglas, concurring in *Baker v. Carr* [369 U.S. 186, 198, 82 S.Ct. 691, 699, 7 L.Ed.2d 663 (1962) ] "any relief accorded can be fashioned in the light of well-known principles of equity."

*Reynolds v. Sims*, 377 U.S. 533, 585, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506 (1964).

Four years later, in *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), the Supreme Court was again confronted with the prospect of disruption of the electoral process, this time as a result of a challenge to the constitutionality of Ohio's election laws. Those laws required new political parties seeking ballot positions in presidential elections to file petitions signed by qualified electors totaling 15% of the number of ballots cast in the last gubernatorial election. Previously, a three-judge district court had found these laws unconstitutional and ruled that the two political parties seeking relief were entitled to write-in space but not ballot position. Both appealed the decision to the Supreme Court.

The Ohio American Independent Party immediately sought interlocutory relief from Justice Stewart, which he granted after a hearing at which Ohio represented that it could place the party's name on the ballot without disrupting the election, provided there was not a long delay. Several days later, the Socialist Labor Party asked for similar relief, which Justice Stewart denied on the basis that it would result in serious disruption of the political process.

In his subsequent opinion for the Court, Justice Black commented:

... [T]he State now repeats its statement that relief cannot be granted [to the Socialist Party] without serious disruption of election process. Certainly at this late date it would be extremely difficult, if not impossible, for Ohio to provide still another set of ballots. Moreover, the confusion that would attend such a last-minute change poses a risk of interference with the rights of other Ohio citizens, for example, absentee voters. Under the circumstances we require Ohio to permit the Independent Party to remain on the ballot, along with its candidates for President and Vice President, subject, of course, to compliance with valid regulatory laws of Ohio, including the law relating to the qualification and functions of electors. We do not require Ohio to place the Socialist Party on the ballot for this election.

*Williams v. Rhodes*, 393 U.S. 23, 35, 89 S.Ct. 5, 12, 21 L.Ed.2d 24 (1968). *See also Whitcomb v. Chavis*, 396 U.S. 1055, 90 S.Ct. 748, 24 L.Ed.2d 757 (1970), and 396 U.S. 1064, 1065, 90 S.Ct. 761, 762, 24 L.Ed.2d 757 (1970) (Douglas, J., dissenting) (by granting stay of judgment pending appeal, Court "forced the respondents to go through the [state legislative] election under the ... scheme ... held unconstitutional by the District Court").

Likewise, the Fourth Circuit Court of Appeals has not been reluctant to deny injunctive relief when actions challenging state apportionment plans are filed so close to election day that they threaten great disruption of the electoral process. *See Maryland Citizens For A Representative General Assembly v. Governor of Maryland*, 429 F.2d 606, 610 (4th Cir.1970) (upholding dismissal of suit challenging apportionment plan for Maryland General Assembly, filed thirteen weeks prior to filing deadline for Assembly candidates); *Simkins v. Gressette*, 631 F.2d 287, 295–296 (4th Cir.1980) (upholding denial of equitable relief in action brought two days before opening of filing period for state senate seats and sixteen days before deadline).

Moreover, in language seemingly borrowed from the transcript of defense counsel's opening statement at the hearing in the present case, the United States District Court for Maryland denied injunctive relief in a suit challenging the constitutionality of a state statute providing for the selection of delegates to a political convention:

No valid reason appears why plaintiffs waited until less than eight weeks before the election to bring this case. The law they now challenge was in its present form not later than July 1, 1971. Much of the data upon which they base their claim was available by that date and at the latest by December 1971....

... The court finds ... support for defendants' argument that the election process which will culminate on May 16, is an evolving one starting months, if not years, ago. The deadline for filing of candidates was March 6, almost two weeks before this case was commenced. The deadline for withdrawal of candidates has already passed on April 3. Five hundred fifty candidates have filed for delegate to the Democratic National Convention. Alliances have been formed, as represented by the designation of various delegates by presidential contenders.

It is true as plaintiffs say that the election process is one fraught with uncertainty. It does not follow, however, that a court should add a further element of wholly unanticipated uncertainty into the process at the eleventh hour....

This court is persuaded that plaintiffs' claim is barred by laches and that the lateness of the hour precludes the issuance of injunctive relief.

*Barthelmes v. Morris*, 342 F.Supp. 153, 160–161 (D.Md.1972).

Just one year earlier, in *Dobson v. Mayor and City Council of Baltimore City*, 330 F.Supp. 1290, 1301–1303 (D.Md.1971), the same court had refused to enjoin city council elections in an action challenging the constitutionality of a redistricting ordinance. Noting that the civil rights suit was not filed until more than three months after the redistricting plan became law, ten days after the filing date, and two months before the primary, that some 110 candidates had filed their nomination papers and were vigorously campaigning, and that the validity of the plaintiffs' claim for relief turned on legal questions the answers to which were unclear, the Court dismissed the case without prejudice. *Id.* at 1303. *See also Hogue v. Auburtin*, 291 F.Supp. 1003, 1004 (S.D.Ala.1968) (complaint filed too close to election date to "permit the proper development of evidence that would justify the extraordinary relief sought of enjoining an election which includes state and national candidates").

There are, of course, cases in which the defense of laches has not been recognized so as to preclude judgment enjoining an upcoming election. *See, e.g., Michaelson ex rel. Lewis v. Booth*, 437 F.Supp. 439, 444 (D.R.I.1977) (city charter establishing municipal election on Jewish religious holiday found to be unconstitutionally onerous, justifying two-day postponement of election). Yet under the circumstances of the present case, the Court is convinced that the sound counsel of *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and its progeny should be needed. Having found both an inexcusable delay in plaintiffs' assertion of their claim for relief and the prospect that defendants would be unduly prejudiced if that relief were granted, the Court concludes that a valid defense of laches has been established, necessitating the denial of the pending motion for a preliminary injunction.

### Conclusion

Because the Court has resolved this matter on the threshold legal issue discussed herein, it does not reach the merits of plaintiffs' position that the redistricting plan itself unlawfully dilutes the voting strength of black and Hispanic residents of Milwaukee County. Nor does the Court resolve any of the other fundamental legal questions raised by the defendants, paramount among them, whether the Milwaukee County Board of Supervisors has been properly joined as a party defendant and whether Section 2 of the Voting Rights Act as amended should be applied retrospectively to test the validity of the 1982 reapportionment plan. As plaintiffs proceed on

their underlying complaint, these matters will surely require the Court's studied resolution.

With today's ruling, the Court finds only that plaintiffs' claim for injunctive relief, based on alleged violations of Section 2 of the Voting Rights Act as amended and the Fourteenth, Fifteenth, and Nineteenth Amendments to the Constitution is wholly barred under the equitable doctrine of laches. Plaintiffs' inexcusable delay in filing their motion and the certain prejudice defendants would suffer if the upcoming elections were enjoined necessitate that the Court exercise its discretion to deny relief.

Accordingly, for the reasons stated herein, the Court hereby DENIES plaintiffs' motion for a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure.