Vincent K. KNOX, et al., Plaintiffs,

and

United States of America, Plaintiff-Intervenor,

v.

MILWAUKEE COUNTY BOARD OF ELECTION COMMISSIONERS, et al., Defendants.

No. 83–C–2039.

United States District Court, E.D. Wisconsin.

April 19, 1985.

Richard Congdon, Waukesha, Wis., for plaintiffs Knox, et al.

Patricia J. Gorence, Milwaukee, Wis., and Paul Hancock, U.S. Dept. of Justice, Washington, D.C., for plaintiff-intervenor United States.

George E. Rice, Milwaukee, Wis., for defendant Milwaukee County Bd. of Election Com'rs.

## DECISION AND ORDER

### BACKGROUND

WARREN, District Judge.

On May 15, 1984, approximately three months after this Court issued its order denying their motion for preliminary injunctive relief, 581 F.Supp. 399, the plaintiffs filed an amended complaint in this action alleging, as before, violations of Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and of 42 U.S.C. § 1983, for deprivations of rights secured under the Fourteenth and Fifteenth Amendments to the United States Constitution.

Specifically, the plaintiffs charge that a reapportionment plan, based on 1980 census statistics and approved by the defendants in February and March of 1982, unfairly adjusted the various boundaries of the Milwaukee County supervisory districts. Specifically, it is the plaintiffs' principal contention that the challenged redistricting plan unlawfully dilutes black and Hispanic voting strength by denying members of those minority groups an equal opportunity to participate in the electoral process and to elect candidates of their choice to public office. The plaintiffs explain the motivation for their challenge to the 1982 reapportionment as follows:

> Voting in the County of Milwaukee is and has been racially polarized in elections in which a black or Hispanic candidate has run for office, with white voters generally voting for white candidates, and black or Hispanic voters voting for non-white candidates for elective office.

> Black and Hispanic citizens of the County of Milwaukee have long suffered from and continue to suffer from the results and effects of invidious discrimination and treatment in education, employment, income, health, living conditions, and other related areas.

> The County governing board has been and is unresponsive to the particular needs, interests and concerns of the black and Hispanic communities.

Plaintiffs' *Amended Complaint* at 3–4 (May 16, 1984).

Based on their implicit contention that the boundaries established by the redistricting plan effectively prevent them from remedying the effects of the discrimination that they have suffered, the plaintiffs, as indicated above, seek declaratory judgment that the reapportionment plan unlawfully diminishes their voting strength, thereby denying to them those rights secured by Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973; 42 U.S.C. § 1983; and the Fourteenth and Fifteenth Amendments to the United States Constitution. By the ad damnum clause of their complaint, the plaintiffs also seek an order permanently enjoining the defendants and their agents from "any further implementation or enforcement of, and from holding any further primary or general elections under said plan," Plaintiffs' *Amended Complaint* at 5 (May 16, 1984), and, in this context, request that the Court implement a new plan for the election of members of the Milwaukee County Board of Supervisors that effectively remedies the civil rights violations complained of. Finally, the plaintiffs seek recovery of those reasonable attorneys' fees and costs incurred in their prosecution of this case, along with such other relief as the Court may find just and equitable.

By their answer of June 6, 1984, to the plaintiffs' amended complaint, the defendants deny all material allegations incorporated therein and object, in particular, "to application of venue of the court in respect to any jurisdiction over the Milwaukee County Board of Supervisors in that all members of said board who adopted on February 18, 1982 the ordinance being questioned have not been named as co-defendants or served with process so as to obtain in personam jurisdiction." Defendants' *Answer* at 1 (June 6, 1984). Significantly, the defendants also raise by their answer some six affirmative defenses—namely, that the plaintiffs have failed to exhaust those administrative and legislative remedies available to them; that they are guilty of laches and thus undeserving

of equitable relief; that this matter is not properly certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure; and that Chapter 3 of the County General Ordinances, formally implementing the challenged redistricting plan, is presumed to be constitutional. Most importantly, however, the defendants reaffirm their companion positions, first articulated at the hearing on the petition for injunctive relief, that the plaintiffs' failure to serve each of the county supervisors responsible for adoption of the reapportionment plan prevents this Court from exercising personal jurisdiction and that Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, is unconstitutional as applied to this case; in the defendants' view, that statute

> violates the separation of powers doctrine; is in violation of Article IX and Article X Amendments to U.S. Constitution and Article XIV, Section 1 Amendments to U.S. Constitution, and further that said law has no application to the Milwaukee County Board of Supervisors redistricting in 1981–1982 in that it constitutes a type of ex post facto legislation which results in a manifest injustice if applied retroactively thereby violating Article I, section 9, 3rd clause of the U.S. Constitution, as well as principles of application pronounced by the U.S. Supreme Court to prevent manifest injustice when retroactivity is being attempted.

Defendants' *Answer* at 3 (June 6, 1984).

Presently before the Court in this matter are the four motions filed by the parties since the *Decision and Order* of February 17, 1984, 581 F.Supp. 399, denying the plaintiff's motion for a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure: Approximately one month after the plaintiffs completed service of their amended complaint, the defendants filed a motion to dismiss that pleading on the basis that, as first argued some fourteen months ago, service was not effected on each of the 25 members of the Milwaukee County Board of Supervisors

actually responsible for the adoption, on February 18, 1982, of the challenged reapportionment plan. Several weeks later, on August 6, 1984, the defendants filed a companion motion to dismiss the action pursuant to the equitable doctrine of laches and based on their contention that a so-called "retroactive" application of Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, to the facts of this case would prove unconstitutional. The defendants' two substantive motions have been fully briefed by the parties and are now ripe for resolution. Based on the Court's careful consideration and analysis of the positions articulated in support of and in opposition to dismissal, the Court concludes, for the reasons set forth herein, that both motions must be denied.

The remaining two motions now pending were both filed by the plaintiffs on August 16, 1984; by the first of these, the movants request that all evidence received on the application for preliminary injunctive relief that would be admissible upon the trial on the merits be incorporated in the trial record, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. As the parties are aware, the Court granted this motion at the status hearing of September 6, 1984; with today's order, that ruling is formally memorialized. By the last of the four motions now before the Court, the plaintiffs seek certification to prosecute their claims as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure. Although this matter is now fully briefed by the parties, the Court will hold resolution of this matter in abeyance pending oral argument, as scheduled herein, on the merits of class certification.

## THE DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

As indicated above, the defendants seek dismissal of this action, in part on the basis that, in amending their complaint on May 15, 1984, and serving the present 25 members of the Milwaukee County Board of Supervisors, the plaintiffs "either overlooked or failed to recognize and appreciate that it is not the act of the present County Board of Supervisors that is being challenged but the validity of the act which the county board membership on February 18, 1982 adopted in approving Milwaukee County Ordinance Chapter 3." Defendants' *Memorandum in Support of Motion to Dismiss* at 1–2 (June 15, 1984). Specifically, the defendants contend that three former members of the board—namely, Paul A. Henningsen, James J. Lynn, and Joseph M. Hutsteiner, each of whom participated in the decision to adopt the challenged redistricting plan and are thus necessary and indispensable parties to this action—were never properly served with the summons and complaint. Characterizing the plaintiffs' civil rights allegations as directed not to the members of the present Milwaukee County Board of Supervisors but to those who voted to adopt Chapter 3 of the County General Ordinances on February 18, 1982, the movants conclude that complete relief cannot be dispensed absent joinder of each member of the previous county board; that the Court's *in personam* jurisdiction over all necessary parties has thus not been established; and that plaintiffs' amended complaint should accordingly be dismissed.

As a threshold matter, the plaintiffs abide by their position, adopted and argued throughout the proceedings attendant on their request for preliminary injunctive relief, that the members of the Milwaukee County Board of Supervisors need not be served individually for the Court to exercise complete jurisdiction over that legislative body and to address those civil rights allegations made against it. While thus maintaining that service of the summons and complaint on past board members is not necessary to a complete adjudication of their claims, the plaintiffs, perhaps in an abundance of caution, have in fact served former supervisors Henningsen, Lynn, and Hutsteiner with process, pursuant to Rule 4 of the Federal Rules of Civil Procedure. Indeed, the Court notes that these three parties are specifically named as defendants in the *Amended Complaint* of May

15, 1984, and that service as to each of them was effected as of May 22 or 24, 1984, some three weeks prior to the filing of the defendants' present motion to dismiss. *See* Exhibits to Plaintiffs' *Memorandum in Opposition to Defendants' Motion to Dismiss* (July 3, 1984).

While the Court is inclined to agree with the plaintiffs that joinder of the three former members of the Milwaukee County Board of Supervisors is not a necessary prerequisite to complete disposition of the civil rights claims advanced by this litigation, *see generally Brandon v. Holt,* —— U.S. ——, ——, 105 S.Ct. 873, 876–878, 83 L.Ed.2d 878 (1985) (holding, among other things, that "a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond"), it need not decide the issue since, as stated above, former supervisors Henningsen, Lynn, and Hutsteiner have now been served as proper parties-defendant. Noting that the movants themselves would acknowledge the futility of their motion if the purportedly defective service were remedied, the Court concludes that the central issue raised by the parties' procedural dispute is now moot. Accordingly, the defendants' motion of June 15, 1984, to dismiss the plaintiffs' amended complaint for lack of personal jurisdiction will be denied.

## THE DEFENDANTS' MOTION TO DISMISS BASED ON LACHES AND THE CONSTITUTIONAL IMPORT OF SECTION 2 OF THE VOTING RIGHTS ACT OF 1965, AS AMENDED

### I.

■ By the first of its arguments in support of dismissal of this action in toto, the defendants charge the plaintiffs with inexcusable delay in bringing their civil rights claims nearly two years after adoption of the county-wide reapportionment plan. Describing as untimely the present challenge to the supervisory district boundaries, the movants explain their considerable efforts to

solicit[ ] suggestions in the development of the plan. Everything was in public and accomplished according to the dictates of the laws, both statutory and court created, which existed at that time. The plaintiffs, and the class they purport to represent, failed to voice their objections to the plan. . . . [T]his indefensible delay in challenging the redistricting plan would result in significant prejudice to the defendant if successful.

Defendants' *Memorandum in Support of Motion to Dismiss* at 2–3 (August 6, 1984). The defendants postulate four particular forms of prejudice they would likely incur if ordered to redraw the present district boundaries as one element of the relief afforded the plaintiffs: First, they point to the considerable expenditure of time and resources necessary to complete the formidable task of reapportionment—a task just completed some three years ago. Second, the movants maintain that, if required to prepare a supplemental redistricting plan, they would be violating both the letter and spirit of state statutes governing the establishment of county-wide election plans.

Third, it is the defendants' position that several of the present county supervisors—perhaps most notably, Supervisors Thomas W. Meaux and Betty L. Voss—might suffer considerable political harm since their decisions to run for seats on the Milwaukee County Board of Supervisors were premised, at least in part, upon the reasonable expectation that the 1982 reapportionment plan, with its present district boundaries, would remain in force throughout the election and, thereafter, during the entire course of their terms. Finally, the movants argue that the electorate itself would sustain substantial prejudice if the 1982 redistricting plan were now discarded and replaced by another; a realignment of supervisory districts at this late date would result in considerable confusion among Milwaukee County residents suddenly finding themselves located in new supervisory districts represented by elected officials with

whom they are unfamiliar, or so the argument goes. In short, the defendants maintain that many of the factors the Court found persuasive in the context of the plaintiffs' unsuccessful request for a preliminary injunction should likewise preclude these parties from securing any declarative or permanent injunctive relief.

Predictably, the plaintiffs contend that they are not guilty of laches since the prosecution of their cause of action, continuing since the time of the county-wide elections some fourteen months ago, is neither inexcusably delayed nor likely to result in inequitable treatment of any of the named defendants. In particular, the plaintiffs note that the continued litigation of their civil rights claims poses no immediate threat to the electoral process since nomination papers for the campaign of early 1988 will not be distributed for another twenty months.

Most persuasively, however, the plaintiffs dispute strongly the defendants' speculation of undue prejudice if relief were granted consistent with the ad damnum clause of the *Amended Complaint.* While apparently not denying that the preparation of a revised redistricting plan would necessitate the re-expenditure of both financial and human resources, the plaintiffs suggest that such a commitment to ensure that past voting rights violations are rectified would prove wholly justified. In response to the defendants' concern with respect to violations of state law, the plaintiffs note the plenary powers of the federal district courts to remedy inequities in state electoral proceedings. Finally, the plaintiffs characterize as insignificant any threat of harm to the political careers of incumbent county supervisors and dismiss as inconsequential any purported disruption of the electorate created by the redesignation of district boundaries. The upshot of the plaintiffs' position, as underscored by their discussion of relevant authority on the application of the equitable doctrine of laches, is that the absence of any serious harm to the defendants, when coupled with the serious nature of the voting rights allegations advanced by this lawsuit, necessitates that the motion to dismiss be denied.

As both parties to this action recognize, the Court's decision of February 17, 1984, denying the pending petition for a preliminary injunction, was premised almost exclusively upon the companion findings that the plaintiffs were, indeed, guilty of inexcusable delay in seeking such relief less than two months prior to the scheduled election and that the relief requested would, in fact, unduly prejudice the defendants and the numerous county residents they serve. At that time, the Court explained the concept of laches this way:

> The doctrine of laches was developed by chancellors of equity to prevent the assertion of stale claims and to remedy an injustice that arose from the fact that a statute of limitations ordinarily applicable to a legal right did not apply to an equitable remedy. *Environmental Defense Fund, Inc. v. Alexander,* 614 F.2d 474, 478, *rehearing denied,* 616 F.2d 568 (5th Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980); *Equal Employment Opportunity Commission v. Dresser Industries, Inc.,* 668 F.2d 1199, 1201 (11th Cir.1982). In order for the doctrine of laches to apply today, the defendant must demonstrate both an inexcusable delay by the plaintiff in asserting his or her rights and some undue prejudice to the defendant as a result. *Lingenfelter v. Keystone Consolidated Industries, Inc.,* 691 F.2d 339, 340 (7th Cir.1982); *Rozen v. District of Columbia,* 702 F.2d 1202, 1203 (D.C.Cir.1983).
>
> One of the primary elements in determining when delay is excusable is whether the party against whom the doctrine of laches is being asserted had knowledge of the facts giving rise to his cause of action. *Mathews v. United States,* 526 F.Supp. 993, 999 (M.D.Ga.1981), *aff'd in part and rev'd in part on other grounds,* 713 F.2d 677 (11th Cir.1983); *Armstrong v. Maple Leaf Apartments, Ltd.,* 436 F.Supp. 1125, 1149 (N.D.Okla. 1977), *aff'd in part,* 622 F.2d 466 (10th Cir.1979), *cert. denied,* 449 U.S. 901 [101

S.Ct. 271, 66 L.Ed.2d 131] (1980). In this context, a plaintiff confronted with the laches defense is chargeable with knowledge not only of those facts known to him at the time, but also of facts which he could have learned by means of an inquiry pursued with reasonable diligence. *Anaconda Company v. Metric Tool & Die Company,* 485 F.Supp. 410, 427 (E.D.Pa.1980); *Ward v. Ackroyd,* 344 F.Supp. 1202, 1212 (D.Md.1972).

Precisely what constitutes an unreasonable or inexcusable delay for purposes of the laches doctrine varies with the facts and circumstances of each case. *Carlo v. Gustafson,* 512 F.Supp. 833, 837 (D.Alaska 1981); *Dalsis v. Hills,* 424 F.Supp. 784, 788 (W.D.N.Y.1976). As a general rule, the determination of unreasonableness should focus on the length of the delay and the reasons for it, how the delay affected the defendant, and the overall fairness in permitting the assertion of the claim. *Goodman v. McDonnell Douglas Corporation,* 606 F.2d 800, 806 (8th Cir.1979), *cert. denied,* [100 S.Ct. 1844, 64 L.Ed.2d 267] (1980); *Citizens and Landowners Against the Miles City/New Underwood Powerline v. Secretary of the Department of Energy,* 683 F.2d 1171, 1174 (8th Cir.1982).

Finally, prejudice in the laches context is signaled by a disadvantage in asserting and establishing a claimed right or defense or some other harm caused by detrimental reliance on the plaintiff's conduct. *Pegues v. Morehouse Parish School Board,* 632 F.2d 1279, 1283 n. 5 (5th Cir.1980), *cert. denied,* 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 844 (1981), *appeal after remand,* 706 F.2d 735 (5th Cir.1983); *Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 844 (D.C.Cir.1982). The determination as to the existence of this and all other elements of the laches defense is left to the sound discretion of the trial court, and its decision in this regard will not be set aside absent a clear abuse of that discretion. *Watkins v. Northwestern Ohio Tractor Pullers Association, Inc.,* 630 F.2d 1155, 1163 (6th Cir.1980); [*Lemel-*

*son* ] *v. Carolina Enterprises, Inc.,* 541 F.Supp. 645, 657 (S.D.N.Y.1982). Court's *Decision and Order* of February 17, 1984, at 402–03. Although the Court found these well-established principles compelling in the context of the motion for relief under Rule 65(a) of the Federal Rules of Civil Procedure, it must reject as untenable the defendants' present invocation of the doctrine in an attempt to preclude the further prosecution of this case.

While it remains unfortunate that these plaintiffs did not pursue a more active role in the reapportionment process that began as early as March of 1981, *see* Court's *Decision and Order* of February 17, 1984, at 403–04, their present challenge to the legality of the plan ultimately approved by the Milwaukee County Board of Supervisors on February 18, 1982, is not so untimely as to warrant wholesale dismissal of the important issues raised by their amended complaint. In fact, the temporal nature of all electoral processes is such that, if the defendants' position were uniformly upheld, all challenges to the constitutionality of reapportionment plans would necessarily be dismissed as untimely or inexcusably delayed. Under the circumstances of the present case, the Court is unwilling to so characterize the plaintiffs' litigation strategy.

Furthermore, the Court does not view any of the defendants' speculations as to the nature and scope of the prejudice they will suffer if some form of relief is eventually afforded the plaintiffs as sufficiently meritorious to justify outright dismissal. The companion specters of constituent confusion as to the identity of their elected representatives and supervisor uncertainty as to the future of their political careers on the county board plainly do not rise to the level of undue prejudice sufficient to establish laches. Moreover, while the Court commends the defendants for their well-intentioned interest in abiding by the dictates of state law in drawing district boundaries, the considerable power—even obligation— of the federal trial courts to correct constitutional infirmities in election plans devel-

oped pursuant to state law is now well-recognized. *See Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Chavis v. Whitcomb*, 396 U.S. 1055, 90 S.Ct. 748, 24 L.Ed.2d 757 and 396 U.S. 1064, 90 S.Ct. 761, 24 L.Ed.2d 757 (1970) (discussed in this Court's *Decision and Order* of February 17, 1984, at 405–06).

Perhaps the defendants' strongest argument for dismissal springs from the prejudice they would allegedly incur if forced to undertake again the laborious, resource-consuming process of preparing a revised redistricting plan. Recognizing that a remedial order favorable to the plaintiffs would likely carry with it a considerable price tag, the Court would nonetheless view that supplemental expenditure of time and resources as a necessary consequence of ensuring that the voting rights of all Milwaukee County residents are upheld in a manner consistent with the federal constitution and the statutes enacted to enforce it. By these remarks, the Court does not indicate any predisposition in favor of granting the plaintiffs the relief they now seek; indeed, the Court may well find at the conclusion of the trial that the challenged reapportionment plan does not unlawfully dilute black and Hispanic voting strength, thus denying members of those minority groups an equal opportunity to participate in the political process. What the Court does affirm by today's order is its strong belief that these plaintiffs ought to be afforded the opportunity to present their case in support of that proposition.

## II.

As a preliminary to its discussion of the defendants' second, principal argument in support of their motion to dismiss—a motion which, even if granted, would not dispose of the case but would simply impose upon the plaintiffs a greater burden of proof at trial—the Court invokes the Seventh Circuit's recent discussion of the relevant standards to be applied by trial judges in addressing challenges to the constitu-

tionality of reapportionment plans under Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. In *Ketchum v. Byrne*, 740 F.2d 1398, 1403–1404, (7th Cir.1984), the Court of Appeals explained the significant import of the congressional amendments to the statute this way:

The Voting Rights Act, 42 U.S.C. § 1973, was amended and extended in June 1982. Under the previous version of section 2 of the Voting Rights Act, which had been judicially construed to parallel the fifteenth amendment, a violation could be found only if the discrimination were found to be intentional. *City of Mobile v. Bolden*, 446 U.S. 55, 60–61, 100 S.Ct. 1490, 1495–96, 64 L.Ed.2d 47 (1980). The most significant change brought about by the 1982 amendments was to eliminate the requirement of *intentional* discrimination by substituting a "results" test for the "purpose" test imposed by the Supreme Court and by listing the factors to be considered in determining whether on the basis of the "totality of circumstances" the Act has been violated (emphasis original).

In *City of Mobile v. Bolden*, 446 U.S. 55 [100 S.Ct. 1490, 64 L.Ed.2d 47] (1980), a plurality of four Justices had held that, in order to establish a violation of the fifteenth amendment, a "racially discriminatory motivation" must be established. *Id.* at 62 [100 S.Ct. at 1497] Similar proof of intent was required to establish a violation of the equal protection clause of the fourteenth amendment in racial vote dilution cases. *Id.* at 66 [100 S.Ct. at 1499] The plurality opinion of the Supreme Court also concluded that, because Congress intended section 2 of the pre-1982 Voting Rights Act to track the fifteenth amendment, section 2 also expressly states that it was intended to replace the *Bolden* intent requirement with a "results" standard. Congress intended that, "[i]f the plaintiff proceeds under the 'results test', then the court would assess the impact of the challenged structure or practice on the basis of objective factors, rather than making

a determination about the motivations which lay behind its adoption or maintenance." S.Rep. No. 417, 97th Cong., 2d Sess. 27 (1982) ["Senate Report"], *reprinted in* 1982 U.S.Code Cong. & Ad. News 177 *et seq.*

The standard for determining a Section 2 violation was indicated in the legislative history as follows:

New Subsection 2(b) delineates the legal analysis which the Congress intends courts to apply under the "results test." Specifically the subsection codifies the test for discriminatory result laid down by the Supreme Court in *White v. Regester....* 412 U.S. 755, at 766, 769 [93 S.Ct. 2332, at 2339–40, 2341]. The courts are to look at the totality of the circumstances in order to determine whether the result of the challenged practice is that the political processes are equally open; that is,

whether, members of a protected class have the same opportunity as others to participate in the electoral process and to elect candidates of their choice. The courts are to conduct this analysis on the basis of a variety of objective factors concerning the impact of the challenged practice and the social and political context in which it occurs.

Senate Report at 67 (footnote omitted). Plaintiffs, therefore, need only show "that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process." *Id.* at 27.

 While the defendants in the present case do not challenge the wisdom of the Congress in drafting the 1982 amendments to the Voting Rights Act of 1965,[1] they do contend that application of

1. Citing Judge John F. Grady's dissenting opinion in *Rybicki v. State Board of Elections of the State of Illinois,* 574 F.Supp. 1147, 1160 n. 3 (1983) (*"Rybicki II"*), the defendants do, however, question whether the so-called "results" test was fully accomplished by the 1982 amendments to Section 2 of the Voting Rights Act of 1964, 42 U.S.C. § 1973, as follows:

In our view also the amendment never mentions a "results" test and the phrase used to define the test for determining whether a protected group has "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice" is actually *"the totality of circumstances."* While this phrase certainly includes the "results" of a redistricting "such results" are by no means coterminous with the test.

Defendants' *Memorandum in Support of Motion to Dismiss* at 11 (August 6, 1984); *see also* Defendants' *Reply Brief in Support of Motion to Dismiss* at 8 (August 28, 1984) ("We further submit that a so-called 'results' test is open to future question because several courts have differed on the meaning and extent of the revised version of the 1982 amended act").

Notwithstanding Judge Grady's reservations about the precise import of the 1982 amendments, this Court concludes, based on its own review of the relevant legislative history and the compelling interpretation given that history by the Seventh Circuit, *see Ketchum v. Byrne,* 740 F.2d 1398, 1403–1404 (7th Cir.1984) (cited *supra* at 1119–1120), that it is too late in the day to argue that present Section 2 of the Voting Rights Act mandates proof of anything more than the "results" of the challenged redistricting

plan. Indeed, the term is incorporated in the very language of 42 U.S.C. § 1973, which reads, in its entirety, as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which *results* in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section (emphasis supplied).

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

At the same time, to the extent that the defendants understand the amended statute to require an assessment of alleged voting rights violations based on the "totality of circumstances," they are absolutely correct. As the Court of

the so-called "results" test to the peculiar facts of this case would prove violative of well-established principles of fundamental due process and of the Tenth Amendment to the United States Constitution, reserving to the states or the people those powers not delegated to the federal government. Noting that the challenged redistricting plan was effectively completed and approved on February 18, 1982, the defendants argue that

> [t]he county board was entitled to rely upon *City of Mobile v. Bolden,* [446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) ],

... interpreting Section 2 when it so acted with finality. Having exhausted its state statutory right to reapportion, the county board was confident that there was no "discriminating intent" within the ordained plan nor evident in its legislative history. Certainly the three day hearing involving testimony in January and February, 1984, conclusively supports such a proposition. The action of the U.S. Congress some four months later in changing the legislative standard within Section 2 in the absence of an explicit statutory provision for retroactiv-

Appeals expressly held in *Ketchum v. Byrne,* 740 F.2d 1398, 1404 (7th Cir.1984), "to determine whether a suspect election structure or practice constitutes a violation of section 2 under the 'results' test and in order to remain faithful to Congress' express intent," the trial judge must apply those factors set forth in the report of the Senate Judiciary Committee, as follows:

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals;

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of the plaintiffs' evidence to establish a violation are:

Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

While these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged dilution.

The cases demonstrate, and the Committee intends that there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.

S.Rep. No. 417, 97th Cong., 2d Sess. 27, 28–29 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad. News 177 *et seq.,* 204–207 (footnotes omitted). In addition, the Subcommittee on the Constitution of the Senate Judiciary Committee developed a set of "objective factors" to be invoked, to the extent applicable, by the district courts, as follows:

(1) Some history of discrimination; (2) at-large voting systems or multi-member districts; (3) some history of "dual" school systems; (4) cancellation of registration for failure to vote; (5) residency requirements for voters; (6) special requirements for independent or third-party candidates; (7) off-year elections; (8) substantial candidate cost requirements; (9) staggered terms of office; (10) high economic costs associated with registration; (11) disparity in voter registration by race; (12) history of lack of proportional representation; (13) disparity in literacy rates by race; (14) evidence of racial bloc voting; (15) history of English-only ballots; (16) history of poll taxes; (17) disparity in distribution of services by race; (18) numbered electoral posts; (19) prohibitions on single-shot voting; and (20) majority vote requirements.

S.Rep. No. 417, 97th Cong., 2d Sess. 27, 143–144 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad. News 177 *et seq.,* 204; 315, 316 (footnotes omitted).

These enumerated factors will surely provide the agenda for the prosecution and defense of this case at trial.

ity and federal preemption over state-county heretofore accomplished reapportionment in accordance with U.S. Supreme Court doctrine cannot control without violating ... the U.S. Constitution. No where in the U.S. Constitution is there a delegation to the United States that allows the U.S. Congress to absolutely overturn and substitute its judgment by way of a new standard or test for that which has been reserved and supplied by the State of Wisconsin and providing that standard or test has been followed in accordance with the U.S. Supreme Court interpretation as to what constitutes a violation of the Fifteenth and Fourteenth Amendments, U.S. Constitution, as well as section 2 (intent test) of the Voting Rights Act.

Defendants' *Memorandum in Support of Motion to Dismiss* at 12–13 (August 6, 1984); *see also* Defendants' *Reply Brief in Support of Motion to Dismiss* at 3 (August 28, 1984) ("... [W]hen the facts of the subject case are placed in juxtaposition to the Amended Section 2, the law would be unconstitutional if applied retroactively so as to have a retrospective operation").

The defendants plainly acknowledge some support in the legislative history for the proposition that the 1982 amendments to Section 2 of the Voting Rights Act were intended to apply to pending cases; nonetheless, citing *Bradley v. City of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), the movants maintain that the established exception to application of present law to pre-enactment complaints—that is, when "doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary"—is appropriately invoked here. In short, it is their position that so-called "retroactive application" of the "results" test to a redistricting plan lawfully adopted

several months prior to that significant change in the import of Section 2 of the Voting Rights Act of 1965 would, indeed, result in manifest injustice to the Milwaukee County Board of Supervisors and the hundreds of thousands of citizens they represent. Finally, the defendants interpret none of the appellate court decisions in this area as mandating application of the 1982 amendments to cases, such as this, where the plaintiffs seek not only prospective relief but invalidation of a previously-existing reapportionment plan.

Predictably, the plaintiffs strongly oppose the application of anything other than the "results" test to the allegations in their complaint. Simply stated, it is their view that judicial reference to contemporaneous civil rights laws has been the rule for some two decades and that nothing peculiar to the present litigation justifies its abrogation. Addressing the authority cited by the movants in support of their position, the plaintiffs contend that there is no showing whatsoever of any manifest injustice resulting from application of Section 2 of the Voting Rights Act of 1965, as amended, and, in this context, that the present action is legally indistinguishable from other federal cases in which the present statute has been invoked to remedy past voting rights violations. Parenthetically, the plaintiffs observe that the district boundaries created by the reapportionment plan of February 18, 1982, were not effective until December 1, 1983—nearly one-and-one-half years after the congressional amendments to Section 2.

On the present motion, the plaintiffs are allied with the United States, which has also filed a memorandum supporting the constitutionality of amended Section 2 of the Voting Rights Act of 1965, as applied to the principal allegations and prayers for relief in this case.[2] Citing the relevant

**2.** By its letter of March 20, 1984, the Court certified to the United States Attorney General that the defendants in this action "have drawn in question the constitutionality of Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973." Court's *Letter* of March 20, 1984.

On April 23, 1984, pursuant to 28 U.S.C. § 2403(a), the United States filed "notice that it desires to exercise its rights ... by intervening in this action to defend the pending challenge to the constitutionality of Section 2 of the Voting Rights Act." Plaintiff-Intervenor's *Notice of Intervention* at 1–2 (April 23, 1984). By filing its

portions of the legislative history of the 1982 amendments, the United States demonstrates that the intent of Congress was to eliminate discriminatory elements of all, existing electoral plans—not merely those that might be enacted or modified in the wake of the new legislation. Like the plaintiffs, the United States fails to identify the manifest injustice about which the defendants speculate, as follows:

> Defendants claim the application of Section 2 in this instance would be retroactive because of the unique circumstances presented. Yet, the situation presented in the case at bar cannot be distinguished from any other racial vote-dilution case. In many instances the existing electoral structure has been in existence for many years. The plaintiffs seek the establishment of an election plan that complies with the requirements of federal law. To that end the relief sought is prospective even though the lawsuit alleges that the existing electoral structure unlawfully dilutes minority voting....

Plaintiff-Intervenor's *Memorandum in Support of Constitutionality of Section 2 of the Voting Rights Act* at 4–5 (August 17, 1984). Significantly, the United States also notes that the Court of Appeals for the 11th Circuit, in *United States v. Marengo County Commission*, 731 F.2d 1546 (11th Cir.1984), *appeal dismissed and cert. denied*, —— U.S. ——, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984), recently rejected the precise argument now advanced by the defendants and that the United States Supreme Court has itself, in three discrete contexts, implicitly approved the evaluation of election plans in existence prior to 1982 under those standards now incorporated in Section 2 of the Voting Rights Act of 1965, as amended.

The Court has carefully reviewed the authority cited by the parties in support of and in opposition to the defendants' motion and has, in this undertaking, given consid-

erable thought to the conflicting analyses advanced. Based on this deliberation, the Court concludes that the plaintiffs and the plaintiff-intervenor have the better of the argument. At the outset, the Court observes that the unmistakable intention of the Congress in enacting the 1982 amendments to the Voting Rights Act of 1965 was that discriminatory election plans not be shielded from invalidation by the "intent" requirement articulated by the United States Supreme Court in *City of Mobile v. Bolden,* 446 U.S. 55, 60–61, 100 S.Ct. 1490, 1495–97, 64 L.Ed.2d 47 (1980). In this regard, the Senate Committee on the Judiciary explicitly recognized that "the difficulties faced by plaintiffs forced to prove discriminatory intent through case-by-case adjudication create a substantial risk that intentional discrimination barred by the Fourteenth and Fifteenth Amendments will go undetected, uncorrected and undetered unless the 'results' test proposed for Section 2 is adopted." S.Rep. No. 417, 97th Cong., 2d Sess. 40 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 177 *et seq.,* 218.

The plenary purposes for which the amendments were passed are underscored by the telling remarks of Representative James F. Sensenbrenner and Senator Edward M. Kennedy, both of whom commented during floor debate that "Section 2, unlike the bailout procedure added by this bill, will take effect immediately, and will, of course, apply to pending cases in accordance with the well established principles of *Bradley v. City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974) and *United States v. Alabama,* 362 U.S. 602, 80 S.Ct. 924, 4 L.Ed.2d 982 (1960)," 128 Cong.Rec. H3841 (June 23, 1982) (remarks of Rep. Sensenbrenner); 128 Cong.Rec. S7095 (June 18, 1982) (remarks of Sen. Kennedy). In short, the Court views the legislative admonition that Section 2 of the Voting Rights Act of 1965, as amended, serve as "the major statutory prohibition of all voting rights discrimination," S.Rep.

---

memorandum of law of August 17, 1984, the United States made good on its statement of

intention.

No. 417, 97th Cong., 2d Sess. 30 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad. News 177 *et seq.*, 207, as strong support for the position advanced by the plaintiffs and the plaintiff-intervenor.

Furthermore, the Court finds persuasive the admittedly small body of judicial authority on the constitutionality of the application of the present law to election plans adopted and implemented prior to its passage. In what is perhaps the most exhaustive judicial discussion of this issue, the United States Court of Appeals for the Eleventh Circuit, in *United States v. Marengo County Commission*, 731 F.2d 1546, 1561 (11th Cir.1984), *appeal dismissed and cert. denied*, — U.S. —, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984), found

> nothing "retroactive" about section 2. It does not affect the validity of any election conducted before its passage. Section 2 is no more retroactive than were any of the Voting Rights Act provisions approved in the previous Supreme Court cases [citing *South Carolina v. Katzenbach*, 383 U.S. 301 [86 S.Ct. 803, 15 L.Ed.2d 769] (1966) (approving suspension of literacy tests though valid before the passage of the Voting Rights Act); *Katzenbach v. Morgan*, 384 U.S. 641 [86 S.Ct. 1717, 16 L.Ed.2d 828] (1966) (likewise upholding ban on English language literacy tests valid under pre-1965 standards); and *Oregon v. Mitchell*, 400 U.S. 112 [91 S.Ct. 260, 27 L.Ed.2d 272] (1970) (noting that disapproval of age limits in 1970 amendments did not turn on infirmity retroactive application)].

Most significantly, however, the *Marengo* Court rejected the very position now advanced by the present movants. Upholding the invocation of amended Section 2 in a challenge to an "at-large" method of electing representatives to the county commission, the Eleventh Circuit commented as follows:

> The defendants argue that to apply amended Section 2 "would operate to deprive the state officials of a vested right to enact and/or maintain state laws, which at the time of the enactment, and at the times alleged in this suit, were being maintained under constitutionally acceptable conditions." Brief for Appellees at 8. Even assuming that the at-large system did not violate constitutional or statutory prohibitions effective in 1955 or 1978, the defendants' "vested right" theory is unsound. Under that theory segregated public transit would still be permissible since it was legal (according to *Plessy v. Ferguson* [163 U.S. 537 [16 S.Ct. 1138, 41 L.Ed. 256] (1896) ]) when adopted. The defendants fail to distinguish between retroactive and prospective application of the statute. This court is unconcerned with whether the enactment of the at-large system met the legal standards in effect in 1955. Rather, the question is whether the *present maintenance* of that system meets the standard in effect *now*. No government entity has a "vested right" to continue practices validly prohibited by Congress.

*United States v. Marengo County Commission*, 731 F.2d 1546, 1554 (11th Cir. 1984), *appeal dismissed and cert. denied*, — U.S. —, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984) (emphasis original).

Our own Court of Appeals for the Seventh Circuit reached the same result, although absent the extensive analysis undertaken by the Eleventh, in *Ketchum v. Byrne*, 740 F.2d 1398 (7th Cir.1984) (cited *supra* at 1119–1120). Addressing allegations of Voting Rights Act violations in circumstances startlingly similar to those facts upon which the present action is based, the Seventh Circuit described the reach of the statute simply:

> The legislative history and subsequent judicial interpretation of the 1982 amendments clearly demonstrate that claims of vote dilution come within the scope of the Act. Senate Report at 30 n. 120; *Rybicki v. State Board of Elections of the State of Illinois*, 574 F.Supp. 1147, 1148 (N.D.Ill.1983) (three-judge panel) ["*Rybicki II*"]. As stated in *Rybicki II*, it is clear that the amendments are intended to apply to redistricting plans and that their application to a current redistricting

plan poses no problems of retroactivity because such application is in fact prospective to the elections to be held during the next decade. *Rybicki II,* 574 F.Supp. at 1148 n. 3; *Major v. Treen,* 574 F.Supp. 325, 341–42 n. 20 (E.D.La.1983) (three-judge panel).

*Ketchum v. Byrne,* 740 F.2d 1398, 1404 (7th Cir.1984).

Finally, the Court notes with interest that the Supreme Court's disposition of cases involving challenges to the electoral plans adopted and implemented prior to the 1982 amendments to the Voting Rights Act of 1965 is, at very least, consistent with this court's conclusion. *See City of Lockhart v. United States,* 460 U.S. 125, 133 n. 9, 103 S.Ct. 998, 1003 n. 9, 74 L.Ed.2d 863 (1983) (remanding for, among other purposes, lower court reconsideration of a pre-1982 decision in the context of amended Section 2); *Winter v. Brooks,* 461 U.S. 921, 103 S.Ct. 2077, 77 L.Ed.2d 291 (1983) (vacating district court judgment and remanding for review of congressional reapportionment plan under the 1982 amendments); *Escambia County v. McMillan,* — U.S. —, —, 104 S.Ct. 1577, 1578–79, 80 L.Ed.2d 36 (1984) (remanding to appellate court an action challenging "at-large" school board election plan for "consideration of whether the Voting Rights Act [of 1965, as amended] provides [alternative] grounds for affirmance of the District Court's judgment"). While the Court does not find this authority as compelling as does the plaintiff-intervenor, it does view the Supreme Court's several procedural directives as implicit affirmance of the very position announced today—namely, that no constitutional violation inheres in the application of Section 2 of the Voting Rights Act of 1965, as amended, to the facts of the present case.

In so ruling, the Court fully appreciates the defendants' attempt to distinguish the authority cited above on the basis that the petitioners in those actions sought prospective relief only; indeed, the defendants concede that if the present plaintiffs sought reapportionment solely in anticipation of the 1988 county-wide election, they "would not be arguing the question so vigorously." Defendants' *Reply Brief in Support of Motion to Dismiss* at 6 (August 28, 1984). Since, by its very terms, the *Amended Complaint* seeks declaratory judgment of the invalidity of the 1982 reapportionment plan, the present action is legally and factually distinguishable from those cases cited above, or so the defendants argue. Unfortunately, it is not an argument with which the Court has much sympathy.

The preeminent goal of the Voting Rights Act of 1965 has always been to ensure an effective right of participation in the electoral process; that this continues to be the case. is made "abundantly clear" by the words of the amended statute and its congressional history. *United States v. Marengo County Commission,* 731 F.2d 1546, 1556 (11th Cir.1984), *appeal dismissed and cert. denied,* — U.S. —, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984). The law is violated if a protected class is shown to have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). Moreover, the legislative history both in support of and in opposition to the 1982 amendments is replete with discussion and debate over the broad, remedial import of the so-called "results" test. *See generally* Frank R. Parker, *The "Results" Test of Section 2 of the Voting Rights Act: Abandoning The Intent Standard,* 69 Va.L.Rev. 715, 726–727, 747–754, 762–764 (1983). In the Court's view, it would be anomalous indeed to hold that the amended statute should not be invoked to remedy, if appropriate, civil rights violations of the very sort that provoked its passage.

In the end, the Court finds that application of the amended version of Section 2 of the Voting Rights Act of 1982 will serve the legitimate public interest of purging from the Milwaukee County reapportionment plan any racially discriminatory element without working "manifest injustice" to the parties. In *Bradley v. City of Richmond,* 416 U.S. 696, 717, 94 S.Ct. 2006,

2019, 40 L.Ed.2d 476 (1974), the United States Supreme Court held that in determining whether the application of a new law is just, the trial judge should consider "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." Despite the defendants' strong belief that reference to the 1982 amendments in the litigation of this matter is fundamentally unfair, the Court concludes that the Congress, in affording all citizens a method of remedying discrimination in established voting practices, has guaranteed the present plaintiffs their day in court. Nothing about the rights asserted by the parties to this action suggests otherwise.

To the extent that the ad damnum clause of the *Amended Complaint* presages disruption in the electoral process and confusion among the electorate itself, the Court agrees with the plaintiffs that such concerns are more properly addressed to the scope and timing of any relief granted. At this stage in the proceedings, however, the Court concludes that the defendants' motion to dismiss based on an unconstitutional invocation of Section 2 of the Voting Rights Act of 1965, as amended, must be denied.

### THE PLAINTIFFS' MOTION FOR RECEIPT OF EVIDENCE

■ By their motion of August 16, 1984, the plaintiffs seek "to have any and all evidence received upon the application for the preliminary injunction which would be admissible upon the trial on the merits ... [made a] part of the record on the trial...." Plaintiffs' *Motion for Receipt of Evidence* at 1–2 (August 16, 1984). In support of their request, the plaintiffs properly invoke Rule 65(a)(2) of the Federal Rules of Civil Procedure, which provides, in pertinent part, that "[e]ven when ... consolidation [of a preliminary injunction hearing with the trial] is not ordered, any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial."

The Advisory Committee Notes to the 1966 Amendments to Rule 65(a)(2) explain the purpose of the provision as follows:

... This evidence need not be repeated on the trial. On the other hand, repetition is not altogether prohibited. That would be impractical and unwise. For example, a witness testifying comprehensively on the trial who has previously testified upon the application for a preliminary injunction might sometimes be hamstrung in telling his story if he could not go over some part of his prior testimony to connect it with his present testimony. So also, some repetition of testimony may be called for where the trial is conducted by a judge who did not hear the application for the preliminary injunction. In general, however, repetition can be avoided with an increase of efficiency in the conduct of the case and without any distortion of the presentation of evidence by the parties.

*Notes of Advisory Committee,* 1966 Amendments to Rule 65(a)(2) of the Federal Rules of Civil Procedure, Title 28 of the United States Code; *see also Cass Student Advertising, Inc. v. National Educational Advertising Services, Inc.,* 374 F.Supp. 796, 797 (N.D.Ill.1974) (invoking Rule 65(a)(2) to effect consolidation of evidence); *Ammerman v. City Stores Company,* 394 F.2d 950, 951 n. 2 (D.C.Cir.1968) (likewise).

At the status hearing of September 6, 1984, in this case, the Court, upon defense counsel's notification that his clients do not oppose the plaintiffs' Rule 65(a)(2) motion, ordered that all evidence received at the hearing on the petition for preliminary injunctive relief be made a part of the trial record, to the extent such evidence is admissible. With today's order, the Court memorializes that ruling, noting parenthetically that its decision to grant the plaintiffs' motion does not preclude repetition at trial of such evidence as may be deemed helpful by the Court in resolving the parties' claims on the merits.

## THE PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

On August 16, 1984, the plaintiffs fulfilled the promise implicitly made in their amended complaint to seek certification of a class, pursuant to Rule 23 of the Federal Rules of Civil Procedure. In their memorandum in support of this pending motion, the plaintiffs contend that their cause of action meets all of the prerequisites set forth in Rule 23(a)—namely, that the class is so numerous that joinder of all members is impracticable, that there are questions of law or fact common to the class, that the claims or defenses of the representative parties are typical of the claims or defenses of the class, and that the representative parties both fairly and adequately protect the interests of the class. *See United Independent Flight Officers, Inc. v. United Airlines, Inc.*, 756 F.2d 1274, 1283–84 (1985) (observing, among other things, that the petitioning party bears the burden of satisfying each of the requirements set forth in Rule 23(a)).

Specifically, the plaintiffs argue that numerosity is sufficiently established since joinder of some 150,000 black and 30,000 Hispanic residents of Milwaukee County would prove impracticable. Among these numbers, the movants identify the common question of law or fact as whether the challenged county-wide redistricting plan unlawfully dilutes the voting strength of both minority groups, thus denying them an equal opportunity to participate in the political process; in this context, the plaintiffs also contend that their interest in electing candidates of their choice to public office is typical of and coincides with that of the unnamed class members. Characterizing themselves as "politically active participants of the electoral process," Plaintiffs' *Memorandum in Support of Motion for Class Certification* at 2 (August 16, 1984), the movants maintain that they will properly safeguard the interests of the black and Hispanic communities that comprise the proposed class. The three attorneys representing the named plaintiffs have appended to their clients' memorandum affidavits attesting to their experience and professional competence in prosecuting a class action such as this.

Finally, invoking subsection (b)(2) of Rule 23, the plaintiffs argue that the defendants have acted or refused to act on grounds generally applicable to the racial or ethnic composition of the proposed class, thereby making appropriate final injunctive or declaratory relief with respect to the class as a whole. Parenthetically, the movants also suggest that notice of the pendency of this action to members of the class is effectively accomplished through local media coverage and that class certification here is "particularly appropriate ... because the plaintiffs' class is in a poor position to seek legal redress because of the historic effects of discrimination in education, the lack of equal employment opportunity and the lack of equal economic opportunity ... which makes the cost of litigation inaccessible." Plaintiffs' *Memorandum in Support of Motion for Class Certification* at 4–5 (August 16, 1984).

The defendants oppose class certification in this matter on the principal basis that the plaintiffs have failed to carry their burden under Rule 23 of the Federal Rules of Civil Procedure. While acknowledging that the movants have accurately articulated the well-established prerequisites to securing an order for certification, the defendants describe the present request as a mere recitation of those prerequisites, absent any supporting evidence to suggest that they have, in fact, been met. Assuming, *arguendo*, that the plaintiffs are able to satisfy the numerosity requirement, the defendants contend that neither the commonality nor typicality touchstones have been properly addressed, as follows:

... It is reasonable to assume that some blacks residing in the first or seventh districts may have benefited from the packing that plaintiffs' claim has occurred. Absent any proof, it certainly cannot be assumed otherwise. Moreover, the plaintiffs are alleging claims that appear to be antagonistic towards one another. The black plaintiffs claim that because of "packing" their rights

have been violated and they ask that the members of the black population in Milwaukee County be dispersed over more supervisory districts. On the other hand, the Hispanic plaintiffs complain that the defendants have "dispersed" the Hispanics into a number of county supervisory districts. They ask that their numbers be consolidated or packed into one district in order to increase their voting strength. On the surface it would appear that the black plaintiffs are asking for what the Hispanic plaintiffs have and vice versa....

Defendants' *Memorandum in Opposition to Motion for Class Certification* at 5 (August 30, 1984).

Based on this perceived difficulty in identifying a unified class, the defendants suggest, in the alternative, that the Court consider certification of subclasses, as permitted under Rule 23(c)(4)—a procedure this Court followed in *Leist v. Shawano County,* 91 F.R.D. 64, 69 (E.D.Wis.1981) (finding that "the declaratory relief requested by the plaintiff class differs from the injunctive relief requested by plaintiff subclasses against the individual defendants"). Nonetheless, the defendants do not abandon their principal position that the plaintiffs have not established a sufficient evidentiary basis upon which any certification order might issue.

Having carefully reviewed the plaintiffs' motion papers, the Court is inclined to concur with the defendants that a showing sufficient to justify class certification has not been made on the record compiled to date. At the same time, the Court feels strongly that this significant matter should not be disposed of summarily but that the plaintiffs should be afforded a complete opportunity in which to present appropriate evidence and advance relevant argument in support of their request. In the interest of even-handedness, the Court also opines that the defendants ought to be provided with a forum in which to challenge the plaintiffs' entitlement to certification, particularly on the issues of commonality and typicality.

Accordingly, the Court will conduct a hearing at *10:00 a.m., on Thursday, May 23, 1985,* on the merits of the plaintiffs' pending motion for class certification, pursuant to Rule 23 of the Federal Rules of Civil Procedure. The plaintiffs and the defendants shall each be afforded one (1) hour in which to present such live testimonial or documentary evidence and make such additional oral argument as they deem appropriate. In anticipation of that hearing, the parties are instructed to file and serve brief letters, no later than *Thursday, May 16, 1985,* setting forth the names of any live witnesses and descriptions of any documents they intend to use at the hearing. The Court anticipates resolving the plaintiffs' motion for class certification upon the conclusion of or shortly after the parties' respective presentations.

## CONCLUSION

For the reasons articulated above, the Court hereby DENIES the defendants' motion of June 15, 1984, to dismiss the plaintiffs' amended complaint for lack of personal jurisdiction.

The Court further DENIES the defendants' motion of August 6, 1984, to dismiss the case based on laches or the constitutional import of application of Section 2 of the Voting Rights Act of 1964, as amended, 42 U.S.C. § 1973, to the plaintiffs' cause of action.

The Court further GRANTS the plaintiffs' motion of August 16, 1984, for incorporation of the evidence received upon the application for a preliminary injunction into the record on the trial on the merits, to the extent such evidence is admissible.

Finally, the Court HOLDS IN ABEYANCE a ruling on the plaintiffs' motion of August 16, 1984, for certification of a class, pursuant to Rule 23 of the Federal Rules of Civil Procedure. In order to resolve this matter, the Court will conduct an evidentiary hearing at *10:00 a.m., on Thursday, May 23, 1985,* pursuant to the arrangements set forth herein.

Counsel are instructed to appear at that hearing fully prepared to discuss the merits of their clients' respective positions and to offer such evidence as they deem relevant to the pending motion for class certification. Counsel are further instructed to submit letters, by *Thursday, May 16, 1985,* setting forth clearly their intentions regarding the prosecution and defense of that motion.

The Court expects to be in a position to resolve the plaintiffs' Rule 23 petition, to set appropriate deadlines for the completion of discovery, and to schedule such further proceedings, including trial, as it deems appropriate, at or shortly after the conclusion of the hearing on the twenty-third.